# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 07-1383

_____

Melody Rogers Miner,      *
     *    Appeal from the United States
     Plaintiff - Appellant,      *    District Court for the
     *    Western District of Arkansas
     v.      *
     *    [PUBLISHED]
Local #373, International      *
Brotherhood of Teamsters, and      *
Local #516 , International      *
Brotherhood of Teamsters,      *
     *
     Defendants - Appellees.      *
     *
     *

_____

Submitted: November 16, 2007
Filed: January 25, 2008

_____

Before WOLLMAN and BENTON, Circuit Judges, and DOTY,[1] District Judge.

_____

DOTY, District Judge.

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota, sitting by designation.

Melody Rogers Miner ("Miner") sued her employer Local 373, International Brotherhood of Teamsters ("Local 373") for breach of a collective bargaining agreement ("CBA") and her union Local 516, International Brotherhood of Teamsters ("Local 516") for breach of its duty of fair representation under Section 301 of the Labor Management Relations Act ("LMRA"). Miner also asserted a breach of contract claim against Local 373. The district court granted summary judgment in favor of defendants. Plaintiff appeals, and we reverse.

I.    BACKGROUND

Miner worked for Local 373 as an executive secretary from July 14, 1986, until September 14, 2005. During that period, Local 373 maintained an office in Ft. Smith, Arkansas and had three full-time employees, including a principal officer (Secretary/Treasurer) who was also a directing business agent, a second business agent and an executive secretary. Local 373 also employed a temporary clerical worker for an unspecified period of time. At the time Local 373 hired Miner, her father, Ott Rogers ("Rogers"), was the principal officer. In March or April of 1991, Miner approached Larry Garner ("Garner")—principal officer of Local 516 in Muskogee, Oklahoma—about Local 516 becoming her personal bargaining representative in negotiating a CBA covering the terms of her employment. On April 14, 1991, Locals 373 and 516 entered into a CBA entitled "Office Clerical Addenda" ("Addenda") to govern the employment of Local 373's office clerical employees. The Addenda incorporated by reference the Teamsters' National Master Freight Agreement[2] ("Master Agreement") in its entirety—with the exception of wages—and provided for automatic renewal without notice when the Master Agreement expired

_____

[2] The parties to the Master Agreement also negotiate separate supplemental agreements. At issue in this case is the "Southern Conference Area Local Freight Office Clerical Employees Supplemental Agreement."

-2-

and a new agreement was negotiated. Local 373's executive committee later approved the Addenda.

Article 46 of the Master Agreement provides that an employee can only be discharged for just cause and requires that an employee and the relevant Union receive at least one written warning notice before an employee's discharge. Article 44 provides for the establishment of state or multi-state grievance committees to "adjust the disputes which cannot be settled between the Employer and the Local Union." (J.A. at 204.) Further, article 45 provides that "[w]here a State or Multiple State Committee, by a majority vote, settles a dispute no appeal may be taken to the Southern Region Area Grievance Committee. Such decision will be final and binding on both parties." (Id. at 204.1.)

Miner paid Local 516 a fee of fifteen dollars per month from May 3, 1991, until August 1997. Between March 17, 1992, and August 10, 1993, Randall Sanderson ("Sanderson")—who replaced Rogers as principal officer of Local 373—wrote Garner on five occasions noting Local 373's compliance with the wage increases required by the Addenda. The last written communication with respect to the Addenda before Miner's discharge was a September 11, 1995, letter from Sanderson requesting Garner's signature on two copies of a new Master Agreement effective from April 1, 1994, until March 31, 1998.

On May 25, 1995, the General President of the International Brotherhood of Teamsters ("IBT") sent an electronic message called a Titan message ("1995 Titan") to all Locals stating that one IBT Local cannot properly represent the interests of the employees of another IBT Local because of potential conflicts of interest. Therefore, the message prohibited any future agreements between one Local for the representation of another Local's employees and provided that any such agreements then in effect were to be reviewed upon their expiration. Another Titan message from

June 20, 1997, ("1997 Titan") regarding dual unionism—in which IBT employees are members of an IBT Local and a non-IBT Union—referenced the conflict noted in the 1995 Titan and ordered all Locals to "issue honorable withdrawal cards . . . to all employees and staff who are members of, or represented by, another labor organization and are also dues paying members of a [Local]."

Sanderson resigned as Local 373's principal officer on April 17, 2005. Despite Miner's interest in replacing Sanderson, Stacy Fox ("Fox") was appointed to the position. Miner and Fox's relationship was strained, and on May 2, 2005, Fox sent Miner home and terminated her employment by phone the next day. In response, on May 13, 2005, Miner sent a letter to Jerry Van Allen ("Van Allen")—who had replaced Garner on July 1, 1998. In that letter, Miner sought a copy of the Addenda and requested that Local 516 process her grievance. Miner also sent notice of her grievance to Fox and requested a copy of the Addenda. Van Allen and his secretary searched Local 516's files but could not find the Addenda, and Van Allen called Fox, who indicated that Local 373 did not have a copy either. Unable to obtain a copy of the Addenda, Van Allen wrote to Miner on May 16, 2005, that he was aware of a past agreement between Locals 373 and 516 but that it was not among the active agreements in Local 516's files when he took over and therefore Local 516 could not process her grievance. Miner responded by filing two National Labor Relations Board ("NLRB") charges against Local 516 on or around May 20, 2005, alleging that Local 516 violated the National Labor Relations Act ("NLRA") by not processing her

grievance and by failing to produce a copy of the Addenda.[3] Van Allen responded by letter on May 25, 2005, indicating that no agreement existed between Locals 373 and 516.

On July 14, 2005, Miner mailed Van Allen a copy of the Addenda that she allegedly found in her family Bible. The copy was signed by Rogers and Local 373's Executive Board but not by Garner or another Local 516 representative. Miner also withdrew the NLRB charges. On July 18, 2005, Van Allen wrote to Fox indicating that he was "in possession of what [he] believe[d] to be a bonafide collective bargaining agreement between Teamsters Local 516 and Teamsters Local 373," and requested a meeting to resolve Miner's grievance. (J.A. at 278.) Van Allen also sent Fox a copy of the Addenda. Fox failed to respond, and on July 27, 2005, Van Allen sent another letter proposing an August 2, 2005, meeting date. That same day, Van Allen requested that Miner's grievance be placed on the Southern Multi-State Grievance Committee's ("Committee") August 2005 agenda. Fox responded to Van Allen's letter on August 1, 2005, noting that in light of the 1995 Titan, Local 373 "cannot and does not recognize the purported office clerical collective bargaining agreement alleged to exist between Local 373 and Local 516, nor Local 516's representative status in regard to Local 373 clerical employees in that context." (J.A. at 367.)

On August 1, 2005, Van Allen notified Miner that the Committee would hear her grievance at its meeting in mid-September. At that meeting, which Miner did not attend, Fox, on behalf of Local 373, challenged the validity of the Addenda on a point of order. Van Allen presented a copy of the Addenda to the Committee and argued

---

[3] Miner also filed a protest with the Office of the Election Supervisor for the IBT alleging that she was discharged from her employment because of her stated intention to run for election as delegate and principal officer of Local 373. The Election Supervisor denied the protest.

that Local 373 was bound by its terms. Local 373 offered a rebuttal and introduced the 1997 Titan message. After asking questions regarding Garner's missing signature on the Addenda and Miner's failure to pay fees after August 1997, the Committee upheld Local 373's point of order.

On September 14, 2005, after the Committee dismissed Miner's grievance, she obtained what she claimed to be her personal files from Local 373's office. One of the files contained a copy of the Addenda with Garner's signature.

Miner filed this action on November 10, 2005, asserting claims under Section 301 of the LMRA against Locals 373 and 516 and in the alternative for breach of contract against Local 373. The district court granted summary judgment to defendants on all claims. On appeal, Miner argues that genuine issues of material fact remain as to the existence of a CBA between defendants and as to the adequacy of Local 516's representation. In the alternative, Miner argues that in the absence of a CBA the state law breach of contract claim is not preempted by the LMRA.

 **DISCUSSION**

We review de novo the district court's grant of summary judgment in favor of defendants. Mayer v. Nextel W. Corp., 318 F.3d 803, 806 (8th Cir. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). We view all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

## A.    Section 301(a)

Section 301(a) of the LMRA vests subject matter jurisdiction in the federal courts for "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined by this Act, or between any such labor organizations." 29 U.S.C. § 185(a). An employee can bring a "hybrid" action under Section 301(a) but must show that the employer breached the terms of a CBA and that the union breached its duty of fair representation under that CBA. Scott v. UAW, 242 F.3d 837, 839 (8th Cir. 2006). Moreover, if an employee sues for breach of a CBA under Section 301(a), a court has jurisdiction to consider an affirmative defense challenging the validity of the agreement. Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW, 523 U.S. 653, 657-58 (1998). The Locals argue that there was no valid CBA covering Miner's employment at the time of her discharge and that Local 516 did not breach its duty of fair representation.

## 1.    Validity of the Addenda

The existence of a valid contract between an employer and a labor organization is a necessary prerequisite for federal jurisdiction under Section 301(a). The district

court determined that no contract existed between Locals 373 and 516 at the time of Miner's discharge.  In reaching its conclusion, the district court granted some deference to the Committee's conclusion that the Addenda was invalid.  The Locals argue that the Committee's conclusion binds the court.

When there is no question about the validity and scope of a CBA, it is axiomatic that courts "should not undertake to review the merits of arbitration awards but should defer to the tribunal chosen by the parties finally to settle their disputes."  Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 563 (1976); see also United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36-37 (1987).  The Master Agreement provides for the creation of state or multi-state grievance committees to "adjust the disputes which cannot be settled between the Employer and the Local Union."[4]  (J.A. at 204.)  The Committee, however, did not reach the merits of Miner's claim.  Rather, it determined that it did not have authority to address the merits because there was no valid CBA between Locals 373 and 516.  Therefore, the issue is not whether a court should review the merits of an award by the Committee but rather whether a court should defer to the Committee's threshold determination of the Addenda's invalidity.

We look to what the parties agreed upon to ascertain who determines whether a dispute is arbitrable.  See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995) ("Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." (citations omitted)).  Here, the Locals argue that the Addenda was no longer in force at the time

---

[4] Although the grievance procedures outlined in the Master Agreement are not referred to as arbitration, the actions of the committees "have consistently been considered just as final and binding as if the actions had been called arbitration."  Warren v. Int'l Bhd. of Teamsters, 544 F.2d 334, 340 (8th Cir. 1976) (citations omitted).

of Miner's discharge. Nevertheless, the Locals contend that the Committee's conclusion regarding the Addenda's invalidity binds the court. We find no support for such a proposition. Rather, "whether the parties have a valid arbitration agreement that binds them is a question for judicial determination." Int'l Ass'n of Bridge, Structural, Ornamental, and Reinforcing Ironworkers, Shopman's Local 493 v. EFCO Corp., 359 F.3d 954, 956 (8th Cir. 2004). Therefore, we grant no deference to the Committee's determination.

Federal labor law governs a CBA's validity, and we are not bound by technical rules of contract. See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456 (1957); Pepsi-Cola Bottling Co. v. NLRB, 659 F.2d 87, 89 (8th Cir. 1981). Rather, the crucial inquiry in determining the validity of a CBA "is whether there 'is conduct manifesting an intention to abide and be bound by the terms of an agreement.'" NLRB v. Int'l Bhd. of Elec. Workers, 748 F.2d 348, 350 (8th Cir. 1984) (quoting Capitol-Husting Co. v. NLRB, 671 F.2d 237, 243 (7th Cir. 1982)). This inquiry is a question of fact, see Bobbie Brooks, Inc. v. International Ladies' Garment Workers Union, 835 F.2d 1164, 1168 (6th Cir. 1987), and focuses on the objective intent of the parties—not their subjective beliefs. See Mack Trucks, Inc. v. Int'l Union, UAW, 856 F.2d 579, 592 (3d Cir. 1988) (citation omitted). Here, the Locals argue that even if the Addenda was at one point a valid CBA their subsequent conduct terminated the agreement. Therefore, taking all evidence and inferences in a light most favorable to Miner, the issue is whether the conduct of the Locals manifested an objective intent to terminate the Addenda before Miner's discharge. The district court concluded that "[t]he undisputed facts demonstrate the Titan messages sent are clear that any such contracts are to be disclaimed." (Order at 8.) We disagree.

Neither Titan message is self-executing by its terms. The 1995 Titan articulated the inherent conflict of interest that exists when one IBT Local represents employees

of another IBT Local. The message, however, did not expressly disclaim any such existing agreements. Rather, the message provided that:

> from this date forward no new bargaining relationship should be established covering the employees of a Teamster affiliate by another Teamster affiliate. In cases involving Teamsters Locals where collective bargaining agreements covering the employees of another local union currently apply, the Local Union shall conduct a review upon expiration of those agreements to determine whether federal labor law dictates the disclaimer of future representation of that unit.

(J.A. at 256.) This message was issued on May 25, 1995. The parties' conduct subsequent to the issuance of the message indicates no change in the Addenda's continued validity. Indeed, on September 11, 1995, Sanderson sent Garner a letter requesting his signature on a new Master Agreement, and Miner continued paying fees to Local 516 for more than two years.

Moreover, the effect of the 1997 Titan is ambiguous. Although it referenced the conflict addressed in the 1995 Titan, the substance of the 1997 Titan was dual unionism. Specifically, the express terms of the 1997 Titan limited the message's mandate for the issuance of honorable withdrawal cards "to all employees and staff who are members of, or represented by, another labor organization and are also dues paying members of a Teamster Local Union." (J.A. at 254-55.) There is no express indication that the 1997 Titan also required withdrawal cards to be issued to the employees described in the 1995 Titan. Therefore, the conduct of the Locals determines whether the Addenda remained in effect beyond the issuance of the 1997 Titan.

Certain conduct by the parties suggests that the Locals terminated the Addenda in response to the 1997 Titan: Miner stopped paying her fee to Local 516 around the

same time the 1997 Titan was issued; there was no written communication between the Locals or Miner about the Addenda from September 11, 1995, until after Miner's discharge; Sanderson testified that Local 516 disclaimed the Addenda in 1998 in response to the 1997 Titan and that Garner sent him a letter to that effect; and Van Allen noted that the Addenda was not part of the active files at Local 516 when he took over in July 1998. Other conduct by the parties, however, suggests that the Locals intended to be bound by the Addenda even after the 1997 Titan. First, Miner contends that she voluntarily paid the monthly fee to Local 516, that her representation was not dependent upon payment of that fee and that she stopped payment at the prompting of Garner. Second, the alleged letter from Garner to Sanderson disclaiming the Addenda is not in the record. Moreover, Garner's secretary, Kaye Mogck ("Mogck"), indicated that Garner discussed the 1997 Titan with her and had her type a letter to Sanderson advising him that Local 516 would no longer accept Miner's fees. Mogck, however, noted that the letter "addressed only the fees and did not cancel the [Addenda]," and that Garner told her that he did not intend to cancel the Addenda. (J.A. at 653.1.) Third, Sanderson testified that no change occurred in his working relationship with Miner and that he never conveyed to her that Local 516 would no longer adhere to the terms of the Addenda.[5] Fourth, affidavits from certain members of both Locals' executive boards indicate that the Addenda remained in force. Finally, Van Allen knew of the agreement between Rogers and Garner, but because no copy could be produced, he determined that Local 516 had no duty to represent Miner. However, upon receiving a copy of the Addenda that was not signed by Garner, Van Allen pursued Miner's grievance on her behalf and argued before the Committee that the Addenda was valid. Notwithstanding Local 516's current position, such behavior manifests Local 516's intent to abide and be bound by the terms of the Addenda. Therefore, taking all inferences and reviewing all evidence

_____

[5] We recognize that the relevant inquiry is the objective intent of the Locals, not Miner's subjective understanding of the validity of the Addenda. However, Sanderson's failure to communicate to Miner that she was no longer covered by the Addenda objectively suggests that it remained in effect.

-11-

in a light most favorable to Miner, we conclude that a genuine issue of fact exists as to whether Locals 373 and 516 objectively manifested an intent to be bound by the Addenda on the date of Miner's discharge.

In addition to their argument that the Locals' conduct establishes that they terminated the Addenda, the Locals argue that the Addenda was invalid at the time of Miner's discharge for three independent reasons. First, Local 373 argues that the court lacks jurisdiction because a CBA covering a bargaining unit of one is unenforceable under the NLRA. Pursuant to the so called "single-employee unit" rule, the NLRB does not have the authority to certify single-employee bargaining units because "'the principle of collective bargaining presupposes that there is more than one eligible person who desires to bargain.'" Int'l Transp. Serv., Inc. v. NLRB, 449 F.3d 160, 164 (D.C. Cir. 2006) (quoting Luckenbach Steamship Co., 2 N.L.R.B. 181, 193 (1936)).[6] This, however, does not inexorably lead to the conclusion that all agreements between an employer and a labor organization on behalf of a single employee are invalid. Rather, the NLRB has recognized that an employer may consent to bargain with a labor organization on behalf of a single employee. See Louis Rosenberg, Inc., 122 N.L.R.B. 1450, 1453 (1959). Here, Local 373 consented to Local 516's representation of Miner under the Addenda, making the Addenda a valid CBA. The only issue is whether the Addenda remained valid on the date of

---

[6] Later decisions by the NLRB have expansively interpreted the "single-employee unit" rule to mean that "when a unit consists of no more than a single permanent employee at all material times, an employer has no statutory duty to bargain and thus, will not be found in violation of the [NLRA] for disavowing a bargaining agreement and refusing to bargain." Haas Garage Door Co., 308 N.L.R.B. 1186, 1187 (1992); see also J.W. Peters, Inc. v. Bridge, Structural & Reinforcing Iron Workers, 398 F.3d 967, 972 (7th Cir. 2005). The issue here, however, is not whether Local 373 had the right to disavow the Addenda but whether it actually disavowed the Addenda before Miner's discharge. Therefore, we need not address the validity of the NLRB's expansive application of the "single employee unit" rule.

-12-

Miner's discharge. Therefore, this action falls within Section 301(a)'s grant of jurisdiction. See Gen. Teamsters Union Local No. 174 v. Trick & Murray, Inc., 828 F.2d 1418, 1420 (9th Cir. 1987) ("[A] district court can exercise jurisdiction over an action brought under section 301 even though it involves a contract with a labor organization representing less than two employees.").

Second, Local 516 argues that the Addenda was never effective because Miner was not an "employee" as defined by the NLRA. The NLRA excepts from the definition of an employee "any individual employed by his parent or spouse." 29 U.S.C. § 152. Although Rogers, Miner's father, was Local 373's principal officer at the time the parties signed the Addenda, he did not employ her. Rather, she was hired by Local 373's executive board and employed by Local 373 as an entity. Moreover, even if Miner was not properly characterized as an "employee" under the NLRA at the time the parties signed the Addenda, she was an "employee" from the time Sanderson became principal officer later in 1991. Cf. Campbell-Harris Elec., Inc., 263 N.L.R.B. 1143, 1143 (1982) (child of majority shareholder parents in a close corporation not an "employee" but may have become an "employee" when parents no longer had ownership interest). Thus, Local 516's argument fails.

Finally, relying on Carpenter Benefit Fund v. Holleman Construction, 751 F.2d 763 (5th Cir. 1985), Local 516 argues that the Addenda terminated upon expiration of the Master Agreement. Carpenter Benefit Fund, however, is distinguishable. In that case, the court concluded that a short-form agreement incorporating a master CBA was "ambiguous both as to whether it would continue in existence if there were no existing master agreement and as to whether it incorporates future master agreements." Id. at 769. Therefore, the court deferred to the lower court's factual determination that "the short-form agreement was parasitic upon the existence of a master agreement, and perished with its host." Id. at 769-70. Here, the Addenda explicitly contemplates the incorporation of future agreements providing that "[t]his

-13-

Agreement automatically renews when the [Master Agreement] expires and the new Contract is negotiated and no notice is necessary by Local Union 516." (J.A. at 19.) Therefore, expiration and renegotiation of the Master Agreement did not terminate the Addenda. Accordingly, for these reasons, we determine that a genuine issue of fact exists as to the Addenda's validity on the date of Miner's discharge.

## 2. Local 516's Duty of Fair Representation

The district court also determined in the alternative that if the Addenda was valid at the time of Miner's discharge, her Section 301(a) claim failed because Local 516 did not breach its duty of fair representation. We, however, abstain from deciding this issue. The requirement under Section 301(a) that an employee establish that the labor organization breached its duty of fair representation under the CBA ensures that a court honors the exclusive grievance procedures contracted for between the employer and the labor organization. See Vaca v. Sipes, 386 U.S. 171, 184-85 (1967); see also Chauffers, Teamsters and Helpers Local No. 391 v. Terry, 494 U.S. 558, 564 (1990). This requirement, however, is predicated on the existence of a valid CBA requiring those procedures, and on a decision that the court must honor. Int'l Ass'n of Bridge Ironworkers, 359 F.3d at 956 (whether an issue is arbitrable is a question for the court while procedural issues such as timeliness are for an arbitrator). In the absence of an agreement, the labor organization has no duty that could be breached.

In this case, the Committee determined that there was no valid agreement between Locals 373 and 516. As a result, although Local 516 argued for the validity of the Addenda before the Committee, Local 516 was not permitted to represent Miner on the merits of her grievance. Therefore, by definition, there was no duty for Local 516 to breach. Accordingly, if on remand it is determined that a valid CBA existed between Locals 373 and 516 at the time of Miner's discharge, the proper remedy

-14-

would be remand to the Committee so that Local 516 can represent Miner on the merits of her grievance.[7]

## B.      Preemption of Breach of Contract Claim

In addition to holding that it had no jurisdiction under Section 301(a), the district court determined sua sponte that Section 301 preempted Miner's state law breach of contract claim. If the district court determines on remand that no valid CBA existed at the time of Miner's termination, the issue of whether her breach of contract claim is preempted will arise. Therefore, we address the preemption issue here.

Section 301 requires the creation of federal common law that preempts inconsistent state law. Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 104 (1962). Such preemption extends to "claims founded directly on rights created by a CBA and claims substantially dependent on analysis of a CBA." Clark v. Kellogg Co., 205 F.3d 1079, 1082 n.2 (8th Cir. 2000) (citing Caterpillar Inc. v. Williams, 482 U.S. 386 (1987)). However, "not every dispute concerning employment or tangentially involving a provision of a CBA is preempted by Section 301." Id. (citing Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211 (1985)). Rather, the crucial inquiry is whether "resolution of a state-law claim depends upon the meaning of a [CBA]."

---

[7] We also abstain from addressing Local 373's argument that Miner's action is barred because she did not exhaust her contractual remedies. It is settled that to bring an action under Section 301(a) an employee first "must exhaust any exclusive grievance and arbitration procedures established under [a] collective bargaining agreement." Smegal v. Gateway Foods of Minneapolis, Inc., 763 F.2d 354, 358-59 (8th Cir. 1985) (citations omitted). If the lower court determines that the Addenda was invalid, then there were no grievance procedures for Miner to exhaust. If, on the other hand, the lower court determines that the Addenda was valid, Miner should be given the opportunity to exhaust the grievance procedures for which it provides.

Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 406 (1988). Without a valid CBA between the Locals, Section 301 does not preempt a claim for breach of an individual employment contract because there is no CBA upon which resolution of a state-law claim can depend. See Derrico v. Sheehan Emergency Hosp., 844 F.2d 22, 27 (2d Cir. 1988) ("[A]fter expiration of the CBA there is no contract subject to section 301 and there can be . . . no[] preemption under section 301."); cf. Kidd v. Sw. Airlines, Co., 891 F.2d 540, 541, 543-45 (5th Cir. 1990) (claim for breach of supervisor's employment contract a state law claim and not preempted even though contract allegedly incorporated terms of CBA covering non-supervisor employees).[8]

_____

[8] Neither the lower court nor the parties have addressed whether the NLRA would preempt Miner's alternative breach of contract claim. Two preemption doctrines have developed under the NLRA. First, Garmon preemption "forbids state and local regulation of activities that are 'protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8.'" Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors of Massachusetts, 507 U.S. 218, 224 (1993) (quoting San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 244 (1959)). Moreover, "Garmon pre-emption prohibits regulation even of activities that the NLRA only *arguably* protects or prohibits." Id. (citing Wisconsin Dep't of Indus. v. Gould Inc., 475 U.S. 282, 286 (1986)). Such preemption "protects the jurisdiction of the NLRB by displacing state jurisdiction over conduct which is arguably within the compass of § 7 or § 8 of the Act." Williams v. Watkin Motor Lines, Inc., 310 F.3d 1070, 1072 (8th Cir. 2002) (citations and quotations omitted). Second, Machinists preemption, which is broader than Garmon preemption, "protects against state interference with policies implicated by the structure of the [NLRA] itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated." Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 749 (1985). In other words, Machinists preemption "focuses on protecting the collective bargaining process from interference by the states." Williams, 310 F.3d at 1072 (referring to Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n, 427 U.S. 132 (1976)).

Here, Miner does not allege a defect in the bargaining process between the Locals that would arguably give rise to NLRB jurisdiction. Moreover, recognizing Miner's breach of contract claim would not interfere with the collective bargaining

(continued...)

Accordingly, if on remand the district court determines that the Addenda was not valid at the time of Miner's discharge, the court should either exercise supplemental jurisdiction or dismiss the breach of contract claim without prejudice.

## III.   CONCLUSION

For the reasons stated, we reverse the district court's grant of summary judgment in favor of defendants and remand for further proceedings consistent with this opinion.

_____

---

[8](...continued)
process. Specifically, assuming that the Locals validly terminated the Addenda and took no actions to negotiate a new CBA, there is no justification for the NLRA to preempt a state law breach of contract claim based upon actions taken by Local 373 and Miner outside of the collective bargaining process.