# IN THE SUPREME COURT OF IOWA

No. 96 /03–1869

Filed May 2, 2008

**CEMEN TECH, INC.,** an Iowa Corporation,

Appellant,

vs.

**THREE D INDUSTRIES, L.L.C.,** an Iowa Limited Liability Company, **DEAN LONGNECKER, DANIEL E. JONES, BRADLEY J. LUHRS, JAMES YELTON, SCOTT LONGNECKER, MARK DORMAN, DANIEL POTHAST,** and **DAVID ENOS,**

Appellees.

---

Appeal from the Iowa District Court for Warren County, John D. Lloyd, Judge.

Plaintiff appeals from summary judgment against it in its suit against former employees and others engaged in production of machine competing with plaintiff's. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

William B. Serangeli and CeCelia Ibson Wagner of Smith, Schneider, Stiles & Serangeli, P.C., Des Moines, for appellant.

F. Richard Lyford and Joan M. Fletcher of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellees Three D Industries, L.L.C., Dean Longnecker, Daniel E. Jones, Scott Longnecker, James Yelton, Mark Dorman, Daniel Pothast, and David Enos.

John P. Roehrick and Curtis J. Krull, Des Moines, for appellee Bradley J. Luhrs.

**LARSON**, **Justice**.

When the defendants in this case began to manufacture a cement mixer similar to one manufactured by Cemen Tech (CTI), CTI sued them, alleging breach of contract, misappropriation of trade secrets, unfair competition, and breach of fiduciary duty. The district court granted the defendants' motion for summary judgment on virtually all of the plaintiff's claims, and the plaintiff appealed. We affirm in part, reverse in part, and remand for further proceedings.

## I. Facts and Prior Proceedings.

CTI is a manufacturer of mobile volumetric concrete mixers—machines designed to mix concrete components at job sites. Defendants Dean Longnecker and David Enos, through their business, Three D Company, L.L.C., were interested in purchasing CTI and, on October 25, 1999, sent a letter of intent to CTI requesting information regarding the business. After a number of letters of intent and nondisclosure and confidentiality agreements, CTI provided Longnecker and Enos with business information, including organizational charts; employee handbooks; a strategic plan; and information on customer deposits, assets, accounts payable, accounts receivable, financial statements, and lists of customers and suppliers.

By the spring of 2001, it became clear that Longnecker and Enos were not going to purchase CTI. On June 5, 2001, CTI terminated Three D Company, L.L.C.'s latest letter of intent. Discussions continued, however, between the parties regarding the possible purchase of a portion of CTI's business—its "sludge" division. On September 6, 2001, Longnecker and Enos, through an entity they called "Clarke Industries, L.L.C.," submitted a letter of intent to CTI to purchase the sludge division. CTI apparently ignored it.

In July 2001 Brad Luhrs, an employee of CTI, contacted Longnecker about the possibility of leaving CTI and going to work with Longnecker and Enos to start their own mobile mixer business. By the end of 2001, Dan Jones, Brad Luhrs, Mark Dorman, Dan Pothast, and Scott Longnecker resigned from CTI and began working for Three D Industries developing mobile volumetric concrete mixers in direct competition with CTI.

In January 2002 the defendants exhibited a prototype cement mixer at the World of Concrete show closely resembling CTI's mixer. CTI sued Three D Industries, L.L.C. and eight individual defendants for breach of contract, misappropriation of trade secrets, unfair competition, breach of fiduciary duty, and tortious interference with contract. Defendants Dean Longnecker and Scott Longnecker filed defamation counterclaims against CTI. All defendants moved for summary judgment on CTI's claims. The district court granted the defendants' motion for summary judgment in part and denied it in part, and CTI appealed. Dean Longnecker and Scott Longnecker dismissed their defamation counterclaim without prejudice. CTI dismissed, without prejudice, all of its claims remaining after the district court's ruling on the defendants' summary judgment motion. The issues remaining before this court are those raised by CTI in its appeal from the district court's summary judgment ruling.

## II. Standard of Review.

Review of a ruling on a motion for summary judgment is for correction of errors at law. Iowa R. App. P. 6.4; *Clinkscales v. Nelson Sec., Inc.*, 697 N.W.2d 836, 840–41 (Iowa 2005). Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). A question of fact exists "if reasonable minds can differ on how the issue should be resolved." *Walker v. Gribble*, 689 N.W.2d 104, 108 (Iowa 2004). In reviewing the district court's ruling, the evidence presented must be viewed in the "light most favorable to the party opposing the motion for summary judgment." *Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 641 (Iowa 2000); *Gen. Car & Truck Leasing Sys., Inc. v. Lane & Waterman*, 557 N.W.2d 274, 276 (Iowa 1996). However, the opposing party "may not rest upon the mere allegations of his pleading but must set forth specific facts showing the existence of a genuine issue for trial." *Hlubek v. Pelecky*, 701 N.W.2d 93, 95 (Iowa 2005); *see also* Iowa R. Civ. P. 1.981(5). Speculation is insufficient to create a genuine issue of material fact. *Hlubek*, 701 N.W.2d at 96.

**III. The Contract Claims.**

In count I of CTI's petition, it alleged that Dean Longnecker and Enos breached a contractual nondisclosure agreement dated October 25, 1999, which provided that any information disclosed in the course of the negotiation process would be used solely to evaluate the possible purchase of CTI and would remain confidential. The district court concluded as a matter of law that the October 25, 1999 nondisclosure agreement had been superseded by a January 6, 2000 confidentiality agreement, and we agree. The January 6, 2000 agreement stated: "This Agreement comprises the entire agreement and supersedes all prior understandings and representations (oral or written) between the parties concerning the subject matter of this Agreement." In fact, Gary Ruble, president of CTI, stated it was his understanding that the January 6, 2000 confidentiality agreement had superseded the October 25, 1999

nondisclosure agreement. The district court properly entered summary judgment on this count.

In count II, CTI contends that Dean Longnecker, Enos, and Three D Industries breached a letter of intent dated January 15, 2001. The district court concluded that Enos had not signed the agreement and that Longnecker signed only in a representative capacity (on behalf of Three D *Company*, L.L.C.). Further, Three D *Industries*, L.L.C., the entity sued by CTI, was not a party to the agreement.

We agree with the district court that Enos cannot be held liable for breach of the January 15, 2001 letter of intent because he did not sign it. While Longnecker signed this letter of intent, he did so as a representative of Three D Company, L.L.C. and not in his individual capacity. Of course, "[c]entral to corporate law is the concept a corporation is an entity separate from its owners." *Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 809 (Iowa 1978). Because Longnecker entered into the letter of intent only as a representative of Three D Company, L.L.C., he cannot be held personally liable for any breach committed by the corporation.

Finally, the January 15, 2001 letter of intent was signed by Longnecker as a representative of Three D Company, L.L.C. However, CTI did not bring this breach-of-contract claim against Three D *Company*, L.L.C.; rather, it brought it against Three D *Industries*, L.L.C. It is true, as CTI points out, that Longnecker and Enos created a number of corporations at different times, referring to them as Three D Holding Company, Three D Industries, L.L.C., Three D Company, and Three D Industries. While that complicates the facts of this case, it does not change our analysis of this issue. Three D Company, L.L.C. and Three D Industries, L.L.C. were created as separate and distinct entities and must

be treated as such. Just as individuals cannot be held liable on a contract to which they were not parties, neither can a corporation. The district court appropriately granted Three D Industries' motion for summary judgment on count II of the petition.

Alternatively, CTI argues we can "pierce the corporal veil" to hold Longnecker and Enos individually liable on the letter of intent because any corporations named were merely their alter egos. The requirements for doing so, however, are substantial:

> The burden is on the party seeking to pierce the corporate veil to show the exceptional circumstances required. Factors that would support such a finding include (1) the corporation is undercapitalized; (2) it lacks separate books; (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation; (4) the corporation is used to promote fraud or illegality; (5) corporate formalities are not followed; and (6) the corporation is a mere sham.

*In re Marriage of Ballstaedt*, 606 N.W.2d 345, 349 (Iowa 2000) (citations omitted). CTI showed no evidence to generate a genuine issue of fact to support its piercing-the-veil argument. We affirm the district court's grant of summary judgment on the plaintiff's breach-of-contract claims.

## IV. The Claim of Misappropriation of Trade Secrets.

The principal issue in this case is whether CTI generated a genuine issue of material fact on its claim that the defendants misappropriated CTI's trade secrets, including information regarding the construction of its machines and general information about their manufacture and sale. CTI contends that Three D, Dean Longnecker, Enos, five former CTI employees, and James Yelton (a former CTI customer) wrongfully obtained CTI's trade secrets and used them to form a competing business.

**A. Legal Principles.** Iowa Code chapter 550 (2001) is Iowa's version of the Uniform Trade Secrets Act. This chapter provides that the owner of a trade secret may enjoin an actual or threatened misappropriation of a trade secret or may request monetary damages for such misappropriation. Iowa Code §§ 550.3(1), 550.4(1). A trade secret is defined as

> information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
>
>     *a.* Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
>     *b.* Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4).

The Restatement (Third) of Unfair Competition (1995) [hereinafter Restatement] is intended to be consistent with the Uniform Trade Secrets Act, such as our Code chapter 550, and we rely on it here. *See* Restatement § 39 cmt. *d.* The Restatement provides what we consider to be the appropriate scope of Iowa Code section 550.2(4):

> A trade secret can consist of a formula, pattern, compilation of data, computer program, device, method, technique, process, or other form or embodiment of economically valuable information. A trade secret can relate to technical matters such as the composition or design of a product, a method of manufacture, or the know-how necessary to perform a particular operation or service. A trade secret can also relate to other aspects of business operations such as pricing and marketing techniques or the identity and requirements of customers.

*Id.*

Factors to consider when determining if information is a trade secret include:

"(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken . . . to guard the secrecy of the information; (4) the value of the information [to the business and its competitors]; (5) the amount of effort or money expended . . . in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*Kendall/Hunt Pub'g Co. v. Rowe*, 424 N.W.2d 235, 246 (Iowa 1988) (quoting *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 226 (Iowa 1977) (a common-law case predating Iowa Code chapter 550)).

The value of the information for which protection is sought must be substantial.

A trade secret must be of sufficient value in the operation of a business or other enterprise to provide an actual or potential economic advantage over others who do not possess the information. The advantage, however, need not be great. It is sufficient if the secret provides an advantage that is more than trivial. Although a trade secret can consist of a patentable invention, there is no requirement that the trade secret meet the standard of inventiveness applicable under federal patent law.

Restatement § 39 cmt. *e.*

A trade secret need not be in writing; any secret acquired through an employee's job may be the subject of trade-secret protection. *Sperry Rand Corp. v. Rothlein*, 241 F. Supp. 549, 563 (D.C. Conn. 1964) ("[I]t does not matter whether a copy of a Sperry drawing came out in a defendant's hand or in his head. His duty of fidelity to his employer remains the same."); *accord Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 940 (Wash. 1999). During employment, an employee may acquire two classes of information. First, an employee may obtain information of a general nature simply by being on the job. An employer would have no reasonable expectation that such information would be treated as a trade secret. An employee is free to use or disclose this type of general

information.  The second class of information is that which the employer intends to keep secret by, for example, physically hiding it from view or, as CTI claims here, by requiring confidentiality.  While the first class of information is not entitled to trade-secret protection, the second class may be entitled to it.  *Compare* Restatement § 42 cmt. *b* (trade secrets), *with id.* § 42 cmt. *d* (general information).

Whether an employee is subject to a covenant not to compete is not determinative of whether the information gathered through employment constitutes a trade secret.

> As a general rule, an employee who has not signed an agreement not to compete is free, upon leaving employment, to engage in competitive employment.  In so doing, the former employee may freely use general knowledge, skills, and experience acquired under his or her former employer.  However, the former employee, even in the absence of an enforceable covenant not to compete, remains under a duty not to use or disclose, to the detriment of the former employer, trade secrets acquired in the course of previous employment.  Where the former employee seeks to use the trade secrets of the former employer in order to obtain a competitive advantage, then competitive activity can be enjoined or result in an award of damages.

*Ed Nowogroski Ins. Co.*, 971 P.2d at 941–42 (footnote omitted); *see* Restatement § 42 cmts. *b, c.*

Additionally, nondisclosure and confidentiality agreements are relevant to determine whether information constitutes a trade secret.

> An agreement between the parties that characterizes specific information as a "trade secret" can be an important although not necessarily conclusive factor in determining whether the information qualifies for protection as a trade secret under this Section.  As a precaution against disclosure, such an agreement is evidence of the value and secrecy of the information, and can also supply or contribute to the definiteness required in delineating the trade secret.  The agreement can also be important in establishing a duty of confidence.  However, because of the public interest in preserving access to information that is in the public

domain, such an agreement will not ordinarily estop a defendant from contesting the existence of a trade secret.

Restatement § 39 cmt. *d* (citations omitted).

It is not only the nature of the information itself that is significant; the manner of its acquisition is also significant in determining whether information constitutes a trade secret.

> "The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *However, the interest protected by this branch of the law is not secrecy as such.* "The protection is merely against breach of faith and reprehensible means of learning another's secret." Accordingly, "a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information."

*Clark v. Bunker*, 453 F.2d 1006, 1009–10 (9th Cir. 1972) (quoting Restatement of Torts § 757 cmt. *b* (1939)) (emphasis added). In the case of an employee leaving a business with trade secrets, the employer might "find[] itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995).

**B. Evidence Presented in Resistance to the Motion for Summary Judgment.** In this case, CTI contends that its cement volumetric mixer, component parts, manufacturing processes, and supplier and customer information constitute trade secrets. A CTI officer identified numerous processes and design features developed by CTI that were unique, features that CTI had sought to protect by its confidentiality agreements and which it claimed as trade secrets. This evidence is sufficient to generate a fact question regarding the economic value of the information CTI argues is trade-secret protected.

Evidence in the record shows that CTI took steps to keep such information confidential. CTI required its employees to acknowledge

receipt of an employee handbook. Included in the handbook were nondisclosure agreements providing:

> The protection of confidential business information and trade secrets is vital to the interests and the success of CTI. Such confidential information includes, but is not limited to, the following examples:
>
> > *compensation data
> > *customer lists
> > *financial information
> > *marketing strategy
> > *new materials research
> > *pending projects and proposals
> > *proprietary production processes
> > *research and development strategies
> > *technological data
>
> Employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment and legal action, even if they do not actually benefit from the disclosed information.

In addition, employees were required to sign a "patent" agreement providing, in part:

> All inventions, whether patentable or not, developed by employee in the course of or arising out of the performance of his or her duties as an employee, shall be owned by Employer. Employer shall also own any inventions developed by Employee during the period of his or her employment which relate to the products, services, or other business activities of Employer regardless of whether or not such inventions were developed on or off of company time and on or off of company premises.

Confidentiality agreements such as these may constitute reasonable steps to insure secrecy of information, as required by the Uniform Act. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993). Further, though the district court found the fact that the employees were not required to sign a noncompete agreement persuasive, we do not. As noted above, the absence of a noncompete agreement is not determinative of the existence of a trade secret.

The defendants argue that information regarding CTI's volumetric mixer is not a trade secret because it is "readily ascertainable." This argument is based, in large part, on the concept of reverse engineering. (" 'Reverse engineering is the process by which a completed process is systematically broken down into its component parts to discover the properties of the product with the goal of gaining the expertise to reproduce the product.' " *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 775 n.8 (Iowa 1999) (quoting *Christianson v. Colt Indus. Operating Corp.*, 870 F.2d 1292, 1295 n.4 (7th Cir. 1989))). However, the fact that information may be obtained by lawful means, including reverse engineering, is not necessarily dispositive of the trade-secret issue.

> The theoretical ability of others to ascertain the information through proper means does not necessarily preclude protection as a trade secret. Trade secret protection remains available unless the information is readily ascertainable by such means. *Thus, if acquisition of the information through an examination of a competitor's product would be difficult, costly, or time-consuming, the trade secret owner retains protection against an improper acquisition, disclosure, or use . . . .*

Restatement § 39 cmt. *f* (emphasis added).

In CTI's resistance to the defendants' motion for summary judgment, it provided a report by Dr. Bruce Johnson, who holds a Ph.D. in mechanical engineering and who has considerable experience in design and development engineering. Dr. Johnson evaluated the defendants' reverse engineering claim—he inspected the defendants' prototype machine; he inspected CTI's, as well as the defendants', manufacturing facilities; he inspected the drawings of both CTI and the defendants; and he reviewed witness depositions.

Dr. Johnson stated that a representative of the defendant company told him they did not start construction on their machine until November

2001, and the defendants exhibited their fully functioning machine at a trade show in March 2002. Dr. Johnson concluded:

> It would be impossible for anyone, even a trained and experienced engineer, to complete the design process of a complex piece of machinery such as involved in this instance, to the point of having a perfectly functioning prototype, in less than six months without having at his disposal a vast amount of information. In the context of this case, it is my opinion that it would have been impossible for the Defendants collectively to complete the process without access to the proprietary information of Cemen Tech, regardless of whether that information was in written or other form.

Dr. Johnson's report is strong evidence that, though CTI's machine and component parts could be reverse engineered, the difficulty in doing so may not defeat CTI's trade-secret claim.

Even though CTI conceded that the defendants, if given sufficient time, could produce a machine similar to CTI's based on reverse engineering, a fact finder could reasonably conclude that the delay in production of the machine would give CTI a temporal advantage. Even if the period of that advantage would be short, this would not deny trade-secret protection to CTI because neither Iowa Code section 550.2(4) nor section 1(4) of the Uniform Trade Secrets Act "include[s] any requirement relating to the duration of the information's economic value." Restatement § 39 cmt. *d.* Presumably, the extent of this temporal advantage would be reflected in any damage award.

Finally, the defendants' means of obtaining the information at issue lends credence to CTI's claim that the information was intended to be confidential. Generally,

> [i]nformation that is readily ascertainable by proper means is not protectable as a trade secret, and the acquisition of such information even by improper means is therefore not actionable . . . . However, the accessibility of information, and hence its status as a trade secret, is evaluated in light of

the difficulty and cost of acquiring the information by proper means. In some circumstances the actor's decision to employ improper means of acquisition is itself evidence that the information is not readily ascertainable through proper means and is thus protectable as a trade secret. Because of the public interest in deterring the acquisition of information by improper means, doubts regarding the status of information as a trade secret are likely to be resolved in favor of protection when the means of acquisition are clearly improper.

Restatement § 43 cmt. *d* (citations omitted).

A jury could reasonably find that the employee-defendants took advantage of their positions at CTI to obtain proprietary information that was then used for Three D's benefit. All employee-defendants signed confidentiality and patent agreements in the course of their employment with CTI, indicating their understanding that CTI meant for information gathered during the course of employment to remain confidential. Yet, a jury could find that defendants Mark Dorman and Daniel Pothast used the knowledge and skill obtained through their employment with CTI to develop products for Three D Industries that were similar to those they produced for CTI. CTI's employment of Scott Longnecker (Dean Longnecker's son), at the apparent request of Dean Longnecker, could also suggest an intent to obtain information "from the inside." Additionally, a jury could find that Dan Jones and Brad Luhrs gave Three D Industries information they gathered from CTI in the course of strategy and production meetings, including new product ideas, CTI's engineering data, computations, calculations, and certain innovations. In fact, evidence in the record suggests that Luhrs and Jones copied files from a CTI computer onto CDs that were not returned to CTI upon their resignations. The actions of these defendants could reasonably be considered to be improper and, therefore, "evidence that the information is not readily ascertainable through proper means and . . . thus

protectable as a trade secret." Restatement § 43 cmt. *d.* Viewing the evidence in the light most favorable to CTI, we believe there was sufficient evidence to generate a fact question on the trade-secret issue with respect to the employee-defendants.

We also believe CTI presented sufficient evidence to generate a fact question on the trade-secret issue with respect to Three D, Longnecker, and Enos. A jury could find that these defendants improperly used their positions as potential buyers to obtain CTI's proprietary information for their own benefit. There is evidence in the record that the information disclosed during the due-diligence process was not returned to CTI, and there is evidence that these defendants encouraged the employee-defendants to jump ship to join Three D. A fact finder could infer from the evidence that these defendants induced or knowingly accepted trade secrets from CTI. Under the Restatement,

> a person who obtains a trade secret by inducing or knowingly accepting a disclosure from a third person who has acquired the secret by improper means, or who induces or knowingly accepts a disclosure from a third person that is in breach of a duty of confidence owed by the third person to the trade secret owner, also acquires the secret by improper means.

*Id.* § 43 cmt. *c.*

Finally, we believe CTI has failed to generate a fact question on the trade-secret issue with respect to defendant James Yelton. Yelton was a former CTI customer, but was never an employee, so he was never bound by a handbook or confidentiality agreement. While there is some evidence Yelton became "a part of" Three D, there is no evidence he encouraged CTI employees to obtain trade secrets. In fact, the evidence presented shows the extent of Yelton's involvement in the development of Three D's machine was apparently to furnish photos of CTI's product

obtained by him when he was a customer of CTI. This evidence is simply not sufficient to generate a fact question as to Yelton on the plaintiff's trade-secret claim, and the court's grant of summary judgment as to him was proper.

In summary, we conclude it was error to enter summary judgment on CTI's trade-secret claim, except as to James Yelton. We remand for further proceedings on this issue.

### V. The Unfair Competition Claim.

In count V of its petition, CTI alleged the defendants engaged in unfair competition by "palm[ing] off the products and services sold by them to the public as derivatives of Cemen Tech, which . . . caused a likelihood or probability of confusion as to the source of Defendants' products and services." The district court concluded that a genuine issue of material fact existed as to whether Three D, Longnecker, Enos, and the employee defendants engaged in unfair competition by palming off CTI's products and services as their own. However, the district court ruled that CTI could not pursue a claim of *reverse* palming off because it had not pled that theory in its petition.

"Palming off" occurs when a defendant sells its product under the plaintiff's name. *Walker Mfg., Inc. v. Hoffmann, Inc.*, 261 F. Supp. 2d 1054, 1069 (N.D. Iowa 2003). On the other hand, "reverse palming off" occurs when a defendant sells the plaintiff's product under the defendant's name. *Id.* Both are legal theories a plaintiff may assert to prove unfair competition. *Basic Chems., Inc.*, 251 N.W.2d at 231–32.

The court granted Yelton's motion for summary judgment on the palming-off claim, concluding that CTI failed to present any evidence that Yelton was an owner or employee of Three D or that he participated in the engineering, design, or manufacture of the Three D machine.

However, any shortcomings in the evidence regarding Yelton's status as an owner or employee do not preclude his liability for improper actions in the representations of the machine to potential buyers. Viewing the evidence in the light most favorable to CTI, we believe a jury could find that Yelton was involved in the marketing of Three D's machine and made representations about the relative qualities of the competing machines. We believe it was error for the trial court to sustain Yelton's summary-judgment motion on this issue.

On appeal, CTI contends the district court erred in refusing to allow it to argue reverse palming off as a basis for its unfair-competition claim. Under our rules of civil procedure, a party need not conform to technical forms of pleading. Rather, "[e]ach averment of a pleading shall be simple, concise, and direct." Iowa R. Civ. P. 1.402(2)(a). In Iowa, "notice pleading" is all that is required. Under notice pleading, a petition need only give notice of the incident giving rise to the claim and the general nature of the claim. *Roush v. Mahaska State Bank*, 605 N.W.2d 6, 10 (Iowa 2000). A plaintiff is not required to set forth specific legal theories for recovery. *Id.* at 9.

We conclude the district court erred in refusing to allow CTI to pursue its claim of reverse palming off. CTI's claim in general was that the defendants wrongfully marketed their machine in unfair competition with CTI by fraudulently representing the pedigree of the machines. CTI was not required to identify a particular variety of fraud—palming off or reverse palming off. If CTI's evidence at trial supports both theories, presumably it would be allowed to amend its pleadings to conform to the proof.

We reverse the district court's ruling on this issue insofar as it sustained Yelton's motion for summary judgment and the court's refusal to allow a claim of reverse palming off.

## VI. The Claim of Breach of Fiduciary Duty.

In count VI of its petition, CTI contends the defendants breached their fiduciary duty to CTI. The district court concluded that Three D Industries, Longnecker, and Enos were not in a fiduciary relationship with CTI because their relationship was based on the potential purchase of CTI, and they were acting solely for their own benefit, not that of CTI. The district court further concluded that Yelton was not in a fiduciary relationship with CTI because there was no evidence that Yelton was anything more than a customer and a salesman for CTI's equipment. We agree with the trial court's conclusions as to any fiduciary relationship between CTI and Three D Industries, Longnecker, Enos, or Yelton.

The district court also concluded that the employee-defendants did not have a fiduciary relationship with CTI because CTI failed to present any evidence suggesting that the employee-defendants were anything more than traditional employees. On appeal, CTI contends a jury could reasonably find that the employee-defendants owed a duty of loyalty and a fiduciary duty to CTI arising out of the employee-defendants' representation of CTI to potential customers and suppliers, as well as the trust CTI placed in these employee-defendants to maintain the confidentiality of its proprietary information.

It is true, as the district court noted, that the question of whether a fiduciary relationship exists in a given case may, in some cases, be decided by the court in a summary-judgment proceeding. *See, e.g., Weltzin v. Cobank, ACB,* 633 N.W.2d 290, 292 (Iowa 2001). We do not

believe, however, that this is such a case. In *Kurth v. Van Horn*, 380 N.W.2d 693 (Iowa 1986), we recognized that "fiduciary duty" is

> "[a] very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one man trusts in or relies upon another. One founded on trust or confidence reposed by one person in the integrity and fidelity of another. A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other."

*Kurth*, 380 N.W.2d at 695–96 (quoting *Black's Law Dictionary* 564 (5th ed. 1979) (citations omitted)).

The present case is distinguishable from both *Kurth* and *Weltzin* because here the employees executed confidentiality and nondisclosure agreements. A jury could find that the relationship between CTI and the employee-defendants is, therefore, one based "on trust or confidence reposed by one person in the integrity and fidelity of another." *Kurth*, 380 N.W.2d at 695.

We believe the question of whether a fiduciary relationship has been established turns on the facts of the case and does not lend itself to disposition by summary judgment. We therefore reverse the judgment of the district court regarding the claim of breach of fiduciary duty on the part of the employee-defendants and remand on that issue.

**VII. Summary.**

We affirm the district court's grant of summary judgment as to the plaintiff's contract claims under counts I, II, and III. We also affirm the district court's grant of summary judgment in favor of defendant Yelton on the trade-secret issue raised in count IV. We reverse the summary judgment under count IV as to all other defendants. We affirm the

district court's denial of summary judgment on count V, the unfair-competition claim, as to defendants Three D, Longnecker, and Enos, as well as the employee-defendants. We reverse the summary judgment entered on behalf of defendant Yelton under count V and reverse the court's ruling that CTI could not pursue a claim of reverse palming off. We affirm the summary judgment under count VI, breach of fiduciary duty, as to Three D, Longnecker, Enos, and Yelton, but reverse it as to all other defendants.

We remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Appel, J., who takes no part.