# IN THE COURT OF APPEALS OF IOWA

No. 13-0259
Filed April 8, 2015

**SHI R2 SOLUTIONS, INC., d/b/a DEIMCO FINISHING EQUIPMENT,**
     Plaintiff-Appellant,

**vs.**

**PELLA CORPORATION,**
     Defendant-Appellee.

_____

Appeal from the Iowa District Court for Tama County, Marsha M. Beckelman, Judge.

A plaintiff company appeals a district court's grant of summary judgment on all claims to the defendant. **REVERSED AND REMANDED.**

Darrell G. Meyer, Marshalltown, for appellant.

Sharon Soorholtz Greer of Cartwright, Druker & Ryden, Marshalltown, and Terri L. Combs and Jesse Linebaugh of Faegre, Baker & Daniels, L.L.P., Des Moines, and Randall E. Kahnke and Peter C. Magnuson of Faegre, Baker & Daniels, L.L.P., Minneapolis, Minnesota, and Christopher J.L. Diedrich of Faegre, Baker & Daniels, L.L.P., Denver, Colorado,for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**VAITHESWARAN, P.J.**

A company that sued Pella Corporation for misappropriation of trade secrets and breach of contract appeals the district court's grant of summary judgment in favor of Pella.

## I.    *Background Facts and Proceedings*

SHI R2 Solutions, Inc. (Deimco) designs and manufactures custom finishing equipment. Pella Corporation manufactures windows and doors. Deimco agreed to build custom equipment for Pella. Deimco's president, Kirk Shirar, signed a confidentiality agreement prohibiting the disclosure of Pella's confidential and proprietary information. Pella was not asked to sign a similar agreement prohibiting the disclosure of Deimco's confidential and proprietary information.

In 2004, Pella asked Deimco for a quotation to manufacture an industrial finishing machine with conveyers and ovens. The quotation request form stated, "[a]ny modifications to standard machine configurations shall be the design responsibility of and remain in ownership of the Vendor." The "vendor" was Deimco.

Deimco prepared a quotation and provided Pella with a drawing depicting the equipment, known as an "approval drawing." Deimco's engineering manager testified the drawing was "an overall system drawing that shows the various views of what we are proposing to sell to the customer." The drawing included the following legend: "This drawing contains proprietary information of SHI R2 Solutions, Inc. [Deimco]. Possession thereof does not confer any right to reproduce, use or disclose in whole or in part any such information without written authorization from SHI R2, Inc. [Deimco]." The drawing required the purchaser's endorsement which, according to the engineering

manager, was an acknowledgment the purchaser understood what Deimco intended to build. Dan Bartlett, Pella's project manager at the time, endorsed the drawing. Deimco built the equipment and delivered it to Pella.

Pella and Deimco continued to do business with each other. During the negotiations for another project, Pella tried to change the ownership language contained in its original request for quotation. Pella replaced the language with, "The original machine design and drawings of custom machine will become property of Pella Corporation." Deimco objected and inserted the following language in its quotation, "The machines designs, sub-assembly, and fabrication drawings are the intellectual property of Deimco finishing equipment." Pella acquiesced in this language by indicating its purchase order was pursuant to Deimco's quotation.

Three years after Deimco and Pella began their business relationship, Pella elected to design and produce its own finishing equipment. Under the auspices of maintaining the Deimco machines in its possession, an engineer assigned to the project asked Deimco to turn over sub-assembly drawings of the spray guns inside the machines. Deimco declined the request. In time, Pella disassembled and replicated a Deimco machine, notwithstanding concern among some within the company as to whether the cited proprietary language allowed it to do so.

When Pella informed Deimco the company would not be hired for an upcoming project, Deimco began to suspect Pella was reverse engineering its machines.[1] Deimco

---

[1] A machine designer at Pella testified "reverse engineering" is the process of "measur[ing] something, to see how something functions" and using the measurements as a basis for deriving a design. *See Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 775 n.8 (Iowa 1999) ("'Reverse engineering is the process by which a completed process is systematically broken down into its component parts to discover the properties of the product

filed suit alleging common law and statutory claims of misappropriation of trade secrets and breach of Pella's contractual obligation not to infringe on its intellectual property.[2]

Pella moved for summary judgment. The district court granted the motion and this appeal followed.

## II. Analysis

Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). A question of fact exists "if reasonable minds can differ on how the issue should be resolved." *Walker v. Gribble*, 689 N.W.2d 104, 108 (Iowa 2004). We view the record in the "light most favorable to the party opposing the motion for summary judgment." *Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 641 (Iowa 2000). These summary judgment standards dictate the outcome of the appeal.

### A. Misappropriation of Trade Secrets Claim

As noted, Deimco raised common law and statutory misappropriation of trade secrets claims. Deimco does not argue its common law claim differs in substance from its statutory claim.[3] Accordingly, we will focus on its statutory claim. To the extent the

---

with the goal of gaining the expertise to reproduce the product.'") (quoting *Christianson v. Colt Indus. Operating Corp.*, 870 F.2d 1292, 1295 n.4 (7th Cir. 1989)).

[2] Other claims were dismissed before the court's ruling on the motion for summary judgment.

[3] The Iowa Supreme Court set forth the elements of a common law trade secrets claim as follows: "(1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of the secret." *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 226 (Iowa 1977); *see also Kendall/Hunt Publ'g Co. v. Rowe*, 424 N.W.2d 235, 245-46 (Iowa 1988). A federal court applying Iowa law stated "[t]he elements of a claim of misappropriation of trade secret under the Iowa Uniform Trade Secrets Act and Iowa common

parties import common law trade secret principles, we find it unnecessary to apply those principles because the statute is plain and unambiguous. *See 205 Corp. v. Brandow*, 517 N.W.2d 548, 550 (Iowa 1994) ("It is suggested that the common-law understanding of trade secrets should guide our interpretation of section 550.3(a). We think not; the words of the statute are plain and unambiguous."). *But see Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 7 (Iowa 2008) (considering common law factors in determining if information is a trade secret). Because Iowa's statute is based on a uniform act, we may "look to the comments and statements of purpose contained in Uniform Acts to guide our interpretation of a comparable provision in an Iowa Act" in the absence of "instructive Iowa legislative history." *Office of Citizens' Aide/Ombudsman v. Edwards*, 825 N.W.2d 8, 15 n.2 (Iowa 2012).

Iowa's Trade Secrets Act, Iowa Code chapter 550, allows the owner of a trade secret to obtain damages for misappropriation of a trade secret. Iowa Code § 550.4(1) (2013). Iowa Code section 550.2(4) defines "trade secret" as:

> information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
>     a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>     b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[4]

---

law are practically indistinguishable." *Titan Int'l, Inc. v. Bridgestone Firestone North Am. Tire, LLC*, 752 F. Supp. 2d 1032, 1039-40 (S.D. Iowa 2010).

[4] Iowa Code section 550.2(4) was amended to require satisfaction of "both" requirements rather than "either" requirement. *See Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1425 n.11 (N.D. Iowa 1996) (citing 1991 Iowa Acts ch. 35, § 1 and *Brown v. Iowa Legislative Council*, 490 N.W.2d 551, 554 n.2 (Iowa 1992)).

The parties do not seriously dispute that Deimco's designs for the Pella machines constituted "information" within the meaning of the trade secret definition. They focus on other aspects of their relationship and commercial dealings, which largely implicate the extent to which Deimco made reasonable efforts to maintain the secrecy of the information. *See* Iowa Code § 550.2(4)(b). On this question, the district court found it "undisputed that Deimco publicly disclosed its equipment through public sales and without confidentiality agreements or patent protection in place, and thus did not take reasonable steps to maintain the secrecy of the device."

Whether Deimco used "reasonable efforts" to maintain the secrecy of its information is an issue of fact normally left to the fact-finder. *205 Corp.*, 517 N.W.2d at 551; *see also Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 314 (Iowa 1998). This issue of fact was disputed. Deimco essentially concedes it failed to have Pella execute a formal confidentiality agreement and failed to obtain patent protection for the Pella machines. But, Deimco proffered affidavits, deposition testimony, documents, and expert opinions controverting each of the grounds on which Pella relied to support its assertion that this element of the trade secret definition was not satisfied.

We begin with Pella's reliance on Deimco's display of machines at trade shows. Deimco responded the displayed equipment materially differed from the products sold to Pella. While a Deimco engineering manager acknowledged examining competitors' machines at trade shows and on websites "to see if it's got an advantage over ours," he also stated he "never learned anything specific about how they accomplish that."

Pella also cites tours of Deimco's facility given to Pella employees where, according to Pella, the employees "carefully studied Deimco's equipment and performed

testing with *no* express confidentiality restriction in place." Deimco countered only non-confidential information was disclosed to Pella employees during the tour. It supported this assertion with an expert opinion stating "Deimco's trade secrets could not have been established based upon viewing the laboratory testing conducted at Deimco in November of 2005." See *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 741 (8th Cir. 2000) (noting company "screened tour candidates to ensure that none of its secret information would be at risk" and produced testimony that "none of its trade secrets would be ascertainable to the naked eye by looking at its products because its manufacturing process cloaked the secrets."); *cf. Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 903 (Minn. 1983) (noting memo warning managerial employees to restrict unannounced laboratory tours to protect secrets was never enforced).

Pella next points to drawings posted to Deimco's website. Deimco's president disagreed that anything confidential could be gleaned from them. In his view, the drawings simply gave "an overall view of" Deimco's equipment. Two Deimco experts seconded this view. One of the experts opined that the website contained insufficient information "to reverse engineer the trade secrets manifested in the design of the machine itself." He continued, "[O]ne of ordinary skill in the art could not take the little information available from the website and build the machine."

This brings us to the machines themselves. In Pella's view, "[a]fter buying the equipment every customer had full opportunity to study (and to permit others to study) the 'inner workings' of the Deimco equipment. That is 'unrestricted public consumption,' and Deimco did nothing to protect against it." In our view, the "reverse engineering

argument" goes more to the first prong of the trade secret definition—whether the information was "readily ascertainable." *See* Iowa Code § 550.2(4)(a); *Walker Mfg., Inc. v. Hoffmann, Inc.*, 261 F. Supp. 2d 1054 (N.D. Iowa 2003); Thomas W. Foley, *Keeping a Company's Confidences Secret: Trade Secret Enforcement Under Iowa's Uniform Trade Secrets Act*, 59 Drake L. Rev. 1, 11-13 (2010). However, we will address it here.

The district court cited the deposition testimony of Deimco's engineering manager indicating the design details were fairly basic and could be gleaned in a short amount of time.[5] But this evidence was disputed. Deimco pointed to Pella's own documentation, which revealed it would take 2315 hours to design and build a paint curing oven like the purchased one. *See Cemen Tech*, 753 N.W.2d at 9 ("[I]f acquisition of the information through an examination of a competitor's product would be difficult, costly, or time-consuming, the trade secret owner retains protection against an improper acquisition. . . .") (citing Restatement § 39 cmt. f). Additionally, one of Deimco's experts opined Pella used improper means to reverse engineer the machine.

We are left with Deimco's failure to obtain a confidentiality agreement from Pella. Pella asserts "the lack of a confidentiality agreement . . . means that Deimco did not take reasonable efforts to maintain secrecy." Pella relies on section 41 of the Restatement (Third) of Unfair Competition (1995), which states:

> A person to whom a trade secret has been disclosed owes a duty of confidence to the owner of the trade secret for purposes of the rule stated in § 40 *if:*
>     *(a) the person made an express promise of confidentiality prior to the disclosure of the trade secret;* or
>     (b) the trade secret was disclosed to the person under circumstances in which the relationship between the parties to the

---

[5] The district court noted that this witness attempted to change his testimony via a subsequent affidavit. The court declined to consider his efforts to create a "sham issue of fact." In finding a genuine issue of fact on this issue, we have not considered this affidavit.

disclosure or the other facts surrounding the disclosure justify the conclusions that, at the time of the disclosure,
 (1) the person knew or had reason to know that the disclosure was intended to be in confidence, and
 (2) the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality.

(Emphasis added.) Section 40, in turn, relates to the appropriation of trade secrets. These sections are inapposite because the preliminary and dispositive issue in this case is the definition of a trade secret rather than the appropriation or misappropriation of a trade secret. *See Electro-Craft*, 332 N.W.2d at 903 (stating "[s]ince no trade secrets existed to be misappropriated, we technically need not reach the issue of whether misappropriation occurred"; but proceeding to address the "interrelated" issue). Iowa's definition of trade secret makes no reference to "an express promise of confidentiality." Iowa Code § 550.2(4). For that matter, neither does Iowa's definition of "misappropriation." *See id.* § 550.2(3). The Iowa definitions track the definitions in the Uniform Trade Secrets Act, which, contrary to Pella's assertion, do not preclude a trade secret claim for the "sale of a product without an explicit confidentiality agreement in place." *See* Unif. Trade Secrets Act § 1, 14 U.L.A. 437 (1985). Indeed, in construing our definition, the Iowa Supreme Court has declined to hold the absence of a confidentiality agreement dispositive on the question of whether information constitutes a trade secret. *See Cemen Tech*, 753 N.W.2d at 7-8 (stating a confidentiality agreement "'can be an important although not necessarily conclusive factor in determining whether the information qualifies for protection as a trade secret'") (quoting Restatement (Third) of Unfair Competition § 39 cmt. d)). And, the court has interpreted section 550.2(4)(b) to place emphasis on the "reasonableness" requirement. *See 205*

*Corp.*, 517 N.W.2d at 551 ("The key to this second element of the trade secret test is found in the words 'reasonable under the circumstances.'"); *see also Olson*, 579 N.W.2d at 314 (concluding use of word "inventor" on a drawing generated a jury question on reasonable-efforts-to-preserve-secrecy requirement).

As noted, Pella itself included language in its first request for quotation stating the information belonged to Deimco. Pella attempted to alter the language at a later date, but Deimco objected and inserted language in its quotation emphasizing the proprietary nature of the information. Pella proceeded with the purchase, subject to the added language. Additionally, Pella endorsed the approval drawings, which also contained legends stating the machine designs were proprietary. *Cf. Fail-Safe, LLC v. A.O. Smith Corp.*, 674 F.3d 889, 893-94 (7th Cir. 2012) ("None of the information provided by FS to AOS was marked confidential, nor did FS make it known that it expected this information to remain confidential. . . . Nor did FS take any steps to protect its claimed proprietary information, contractually or otherwise."); *Electro-Craft*, 332 N.W.2d at 903 (finding reasonable efforts to protect secrecy were not made where none of the technical documents were marked "confidential" and "drawings, dimensions and parts were sent to customers and vendors without special marking").

In internal e-mails, Pella acknowledged the quotation language and legends raised concerns about Pella's decision to reverse engineer the machine. Former Pella employee Dan Bartlett attested "[t]he language of Pella's RFQ and Deimco's Approval Drawing make it clear that Pella was prohibited from reverse engineering the Deimco-built equipment and also [was] prohibited from using Deimco's drawings without prior written authorization." Deimco's experts seconded this view, opining the language

revealed an intent to maintain the confidentiality of the design and manufacturing process. Finally, when Pella sought sub-assembly drawings, putatively for maintenance purposes, Deimco refused to turn them over.

We conclude Deimco generated a genuine issue of material fact on whether its efforts to maintain the secrecy of its information were reasonable under the circumstances. *See Wyeth v. Natural Biologics, Inc.*, 395 F.3d 897, 900 (8th Cir. 2005) (stating "[a]bsolute secrecy is not required").[6]

In reaching this conclusion, we acknowledge the existence of adverse authority. *See, e.g.*, *BDT Products, Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 890-93 (E.D. Ky. 2003); *In re Dippin' Dots Patent Litig.*, 249 F. Supp. 2d 1346, 1375-76 (N.D. Ga. 2003); *Contacts Materials Processing, Inc. v. Kataleuna GmbH Catalysts*, 164 F. Supp. 2d 520, 534 (D. Md. 2001). But the Iowa Supreme Court appears to have charted a more fact-intensive course. *See EFCO*, 219 F.3d at 741 (noting "Iowa's broad definition of trade secrets, together with its liberal construction by Iowa courts"); *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 966-68 (N.D. Iowa 2006) (finding significant deficiencies in efforts to maintain secrecy but concluding under Iowa law efforts were reasonable); *S&W Agency, Inc. v. Foremost Ins. Co.*, 51 F. Supp. 2d 959, 979 (N.D. Iowa 1998) (noting jury "reasonably could have determined [. . .] that plaintiffs kept the information secret to an extent that was reasonable under the circumstances"). On this

---

[6] Pella suggests there was no duty of confidence owing to Deimco and we could affirm as a matter of law on this basis. The question of duty bears on the misappropriation element. *See* Iowa Code § 550.2(3)(d) ("Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."). We believe this element raises a mixed question of law and fact. The facts relating to this issue are disputed. Because there is a genuine issue of material fact, we are unable to affirm the summary judgment ruling on the ground there was no duty of confidence as a matter of law.

summary judgment record, we are unable to find the "reasonable efforts to maintain secrecy" requirement satisfied as a matter of law.

We briefly turn to the first prong and the "reasonably ascertainable" requirement.[7] The district court found the information readily ascertainable based on the availability of the information at trade shows, tours of the Deimco facility, and Deimco's postings on the internet, all addressed above. Additionally, the court relied on the ability to reverse engineer a machine, a topic we also addressed above. As with the "reasonable efforts to maintain secrecy" prong, we conclude Deimco generated an issue of material fact on the "reasonably ascertainable" requirement precluding summary judgment in favor of Pella. Accordingly, we reverse the grant of summary judgment to Pella on Deimco's common-law and statutory misappropriation-of-trade-secrets claims.

### B. Breach of Contract Claim

Deimco next challenges the district court's ruling on its breach-of-contract claim. It contends the legend in the approval drawings and the proprietary language in its quotations "imposed an obligation on Pella to refrain from using Deimco's designs, and Pella's development of its own equipment" and the district court erred in concluding otherwise.

As noted at the outset, the legend on each approval drawing read: "This drawing contains proprietary information of SHI R2 Solutions, Inc. [Deimco]. Possession thereof does not confer any right to reproduce, use or disclose in whole or in part any such information without written authorization from SHI R2, Inc. [Deimco]." The pertinent portion of the Deimco quotations read: "The machine's designs, sub-assembly, and fabrication drawings are the intellectual property of Deimco Finishing Equipment."

---

[7] The "economic value" element of the first prong was not contested.

Pella contends the language in the quotation "never became part of a contract between the parties as a matter of law" and, in any event, neither this language nor the legend on the approval drawings prohibited reverse engineering.

To prevail on its breach-of-contract claim, Deimco must prove the following elements: (1) the existence of a contract, (2) the terms and conditions of the contract, (3) performance of all the terms and conditions required under the contract (or excuse from such performance), (4) the defendant's breach of the contract in some particular way, and (5) damage as a result of the breach. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010). We conclude as a matter of law that Deimco and Pella had contracts for the purchase of machines, reflected in requests for quotations, quotations, purchase orders, and approval drawings.

The real question is whether the proprietary language obligated Pella to refrain from replicating the Deimco machines without Deimco's authorization. As a preliminary matter, the parties disagree on the rules of construction to be applied. The Iowa Supreme Court has clarified that "the meaning of a contact 'can almost never be plain except in a context.'" *Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008). Specifically, "'[a]ny determination of meaning or ambiguity should only be made in the light of relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.'" *Id.*; *see also* Iowa Code § 554.2202 (allowing supplementation with evidence of "course of performance, course of dealing, or usage of trade"); *Bartlett Grain Co., LP v. Sheeder*, 829 N.W.2d 18, 23 (Iowa 2013) (noting UCC does not "entirely eliminate the common law of contracts").

"When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact." *Pillsbury*, 752 N.W.2d at 436. Deimco's exhibits and testimony cited in Subpart A, generated a genuine issue of material fact on the question of whether the contract language prohibited Pella from reverse engineering the machine. Accordingly, we reverse the grant of summary judgment as to Deimco's breach-of-contract claim.

### III. Disposition

We reverse the district court's grant of summary judgment in favor of Pella and remand for further proceedings. We find it unnecessary to address any of the remaining arguments raised by the parties.

**REVERSED AND REMANDED.**