**TITAN INTERNATIONAL, INC., an Illinois Corporation, Plaintiff,**

v.

**BRIDGESTONE FIRESTONE NORTH AMERICA TIRE, LLC, a Delaware Corporation; Kenneth Allen, an Individual; and Timothy Ohrt, an Individual, Defendants.**

No. 4:07–cv–00087–JEG.

United States District Court, S.D. Iowa, Central Division.

Jan. 29, 2010.

Kirk Wayne Bainbridge, Brent B. Green, Duncan Green Brown & Langeness P.C., Des Moines, IA, Robert E. Boston, Waller Lansden Dortch & Davis, Nashville, TN, for Defendant.

Gene R. La Suer, Deborah M. Tharnish, Davis Brown Koehn Shors & Roberts P.C., David A. Tank, Dorsey & Whitney LLP, Des Moines, IA, Daniel R. Rosenberg, Briggs & Morgan P.A., Minneapolis, MN, for Plaintiff.

### ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on a Motion for Summary Judgment by Defendants Bridgestone Firestone North America Tire, LLC (BFNA);[1] Kenneth Allen (Allen); and Timothy Ohrt (Ohrt) (collectively, Defendants). Plaintiff Titan International, Inc. (Titan) resists. During the briefing of this motion, Defendants filed a motion to strike the affidavit of Titan's CEO, Maurice Taylor (Taylor). The Court denied the motion to strike but allowed the parties additional time to conduct the depositions of Taylor and Titan President, William Campbell (Campbell), and to supplement the record accordingly. The parties have not requested a hearing, and the Court does not find a hearing is necessary in the resolution of this motion. The matter is fully submitted and ready for disposition.[2]

## I. FACTUAL BACKGROUND

The following facts are either not in dispute or viewed in the light most favorable to the nonmoving party. *Baker v. Silver Oak Senior Living Mgmt. Co., L.C.,* 581 F.3d 684, 685 (8th Cir.2009).

Allen began working for Armstrong Rubber Company (Armstrong) in 1981 as an industrial engineer and later as an account manager in the "original equipment manufacturer" (OEM) sales division. Armstrong was purchased by Pirelli Tire in 1988, which was in turn purchased by Titan Tire in 1994. Under Titan's ownership, Allen worked as an OEM sales account manager and later became Titan's Director of Marketing. Allen did not sign an employment or confidentiality agreement with Titan; however, Allen did receive a Titan employee handbook that listed types of conduct Titan deemed inappropriate and could lead to discipline if an employee engaged in such conduct. Such behavior included "[b]reach of ethics concerning confidentiality of [Titan] or employee information or improper disclosure of trade secrets or confidential infor-

---

1. Titan filed an amended complaint substituting originally-named Defendant Bridgestone Americas Holding, Inc., with Bridgestone Firestone North America Tire.

2. On September 25, 2009, the Court continued the final pretrial and trial of this case due to trial scheduling conflict. The Court ordered the parties to confer and then contact the Court to set new dates. The parties have not contacted the Court to reset the dates or otherwise inform the Court regarding the status of this case. The Court nonetheless proceeds with the disposition of this motion in the absence of such contact.

mation." Titan's App. 17, 20. In his deposition, Allen acknowledged knowing he had a responsibility to keep certain Titan information confidential. Allen resigned from Titan effective June 14, 2002. In the two years preceding his resignation from Titan, Allen did not have direct contact with OEM sales with the exception of two Titan OEM customers located in Mexico that Allen retained because of his Spanish-speaking skills. Titan did not object when Allen resigned.

After resigning from Titan, Allen entered employment negotiations with BFNA and told BFNA that he "did not want to have any kind of fingerprint immediately with North American ... trade customers" and did not want them "to think that any strategies that Titan had were being infiltrated." Titan's Resp. to SUF ¶ 12; Defs.' App. 43, Allen Dep. 41:16–42:3. Allen accepted an export position with BFNA that involved "sales, logistics, compliance with anything related to activity of customers outside of the U.S. and Canada for agricultural tires." Titan's Resp. to SUF ¶¶ 12, 14; Defs.' App. 43. Although BFNA sells more than eight thousand different types and sizes of tires, and is an industry leader in manufacturing, marketing, and selling agricultural tires, BFNA does not compete in the wheel business; whereas Titan is active in the wheel business. Allen held the export position with BFNA for approximately three years.

Ohrt began working in the tire industry as an extruder supervisor for Armstrong in 1981. He later became an OEM salesmen for Armstrong and then for Armstrong–Pirelli. Under Titan's employ, Ohrt's responsibilities consisted primarily of handling OEM sales. The major OEMs Ohrt serviced for Titan were Case New Holland (CNH) and AGCO. CNH was consistently the largest client Ohrt serviced.

After Titan bought out Armstrong–Pirelli, Ohrt was required to sign a document entitled "Confidential Information Agreement and Non–Compete" (the Agreement). The Agreement set out several provisions, including employee confidentiality, employee conduct, reasons for termination, and employment restrictions following termination. Titan did not provide any new consideration beyond continued employment in exchange for signing the Agreement and informed its employees that any employee who did not sign the Agreement would be subject to termination.

Ohrt was informed at the time he signed the Agreement that those who failed to sign the Agreement would lose their job. While Ohrt did sign the Agreement on August 20, 2004, in addition to writing in the margins of the Agreement that he wanted the terms "Conflicting Organization" and "Conflicting Product" clarified, he attached a memorandum to the Agreement setting out several areas of concern he had about the Agreement. Ohrt concluded the memorandum stating, "Please don't misunderstand me in all my questions. As I mentioned I am committed to Titan and plan to work for Titan the rest of my career." Defs.' App. 23; Titan's App. 26; Titan's Resp. to SUF ¶¶ 30, 77. Ohrt was advised that either Titan's legal department or Taylor would respond to Ohrt's questions and concerns; however, as Titan admits, no one at Titan ever responded to Ohrt's concerns.

Sometime in the first quarter of 2004, Ohrt heard from CNH employee Bob Merritt that a position at BFNA would soon be available due to an upcoming retirement. Ohrt submitted a resume for the position, and BFNA invited Ohrt for an interview. Allen, who was then employed by BFNA, was on Ohrt's interview panel. Ohrt denies having discussed the BFNA position with Allen prior to the interview. There is no record of discussions during Ohrt's in-

terview regarding the customers that Ohrt serviced while a Titan employee. Titan insists such discussions were unnecessary because Allen was already aware of the customers that Ohrt serviced for Titan based on Allen's prior employment relationship with Titan and because Ohrt listed his Titan customers on his resume.[3]

Ohrt accepted a position with BFNA as a manager of OEM sales, and BFNA assigned Ohrt to work with existing BFNA customer accounts. Ohrt resigned from Titan in April 2006 without objection from Titan. Titan asserts that it did not object to Ohrt's departure because Ohrt misrepresented the nature of the job that he was taking with BFNA.

Defendants admit Ohrt serviced AGCO as an employee of both Titan and BFNA but argue that BFNA realigned the responsibilities of its account executives in order to avoid potential conflicts for Ohrt upon his arrival. After he commenced employment with BFNA, Ohrt was assigned to work with BFNA's forestry products division. It is undisputed that Titan did not trade in forestry products at that time. Ohrt's top two OEM clients for BFNA were Unverferth and Kubota. Although Ohrt denies any business relationship with either of these customers prior to his employment with BFNA, Titan asserts Ohrt called upon Unverferth while employed by Titan.[4] Nonetheless, Ohrt contends that he has never shared Titan's confidential information with BFNA or his current clients.

Titan filed this diversity action against Defendants alleging claims for (1) misappropriation of trade secrets under the Iowa Uniform Trade Secrets Act, (2) misappropriation of trade secrets under Iowa Common Law, and (3) breach of contract against Ohrt. Defendants move for summary judgment on all claims, which Titan resists.

## II. DISCUSSION

### A. Standard for the Motion

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Christoffersen v. Yellow Book USA,* 536 F.3d 947, 949 (8th Cir.2008). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Miner v. Local 373,* 513 F.3d 854, 860 (8th Cir.2008) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). On a motion for summary judgment, the Court views the evidence and inferences in the light most favorable to the nonmovant. *Id.* The nonmovant "must set forth specific facts sufficient to raise a genuine issue for trial" and "may not rest upon mere denials or allegations in the pleadings." *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### B. Misappropriation of Trade Secrets Claims

Defendants argue Titan cannot prove the existence of a trade secret, and there-

---

**3.** In his application materials provided to BFNA, Ohrt disclosed that he had "a very successful background in both Replacement and Original Equipment Sales with responsibilities in sales techniques, marketing, transportation, company profits, and strategic goals for domestic and international Original Equipment Manufacturers." Titan's App. 27.

Ohrt's resume listed several OEM accounts he managed at Titan, including AGCO and CNH. Ohrt also promoted that he "increased sales while increasing profit margins." Titan's App. 28.

**4.** Unverferth is not listed on Ohrt's resume as an account he managed for Titan.

fore Titan's claims of misappropriation of a trade secret fail under both the Iowa Uniform Trade Secrets Act and the Iowa common law.

### 1. Iowa Uniform Trade Secrets Act

Under the Iowa Uniform Trade Secrets Act,

"trade secret" means information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4)(a)-(b); *see also Econ. Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 646 (Iowa 1995).

Whether particular information constitutes a trade secret is a mixed question of law and fact. The legal part of the question is whether the information in question could constitute a trade secret under the first part of the definition of trade secret in § 550.2(4). The fact part of the question, on the other hand, arises from the remaining part of the statutory definition found in subdivisions (a) and (b) of § 550.2(4). With regard to the factual part of the question, the Court must determine whether Plaintiff has proffered sufficient evidence to demonstrate that [the information in question] both derives independent economic value from not being generally known or readily ascertainable, and whether [Plaintiff] took reasonable measures under the circumstances to maintain the secrecy of the method.

*Sun Media Sys., Inc. v. KDSM, LLC*, 564 F.Supp.2d 946, 966–67 (S.D.Iowa 2008) (internal quotation marks and citations omitted).

The Iowa Supreme Court has adopted Restatement (Third) of Unfair Competition § 39 cmt. d (1995), to define the scope of § 550.2(4).

A trade secret can relate to technical matters such as the composition or design of a product, a method of manufacture, or the know-how necessary to perform a particular operation or service. A trade secret can also relate to other aspects of business operations such as pricing and marketing techniques or the identity and requirements of customers.

*Cemen Tech Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 7 (Iowa 2008) (quoting Restatement (Third) of Unfair Competition § 39 cmt. d (1995)). *See also Sun Media*, 564 F.Supp.2d at 966 (same).

"Trade secrets can range from customer information, to financial information, to information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret. . . ." [A] broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets.

*Econ. Roofing*, 538 N.W.2d at 647 (quoting *U.S. West Commc'n, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993)).

The "value" of the information sought to be protected is defined as

A trade secret must be of sufficient value in the operation of a business or other enterprise to provide an actual or potential economic advantage over others who do not possess the information.

The advantage, however, need not be great. It is sufficient if the secret provides an advantage that is more than trivial. Although a trade secret can consist of a patentable invention, there is no requirement that the trade secret meet the standard of inventiveness applicable under federal patent law.

*Cemen Tech,* 753 N.W.2d at 7 (quoting Restatement (Third) of Unfair Competition § 39 cmt. e (1995)).

In its complaint, Titan alleges Defendants misappropriated five categories of information: (1) pricing and pricing strategies, (2) product costs, (3) product development, (4) customer lists, and (5) customer contracts. In resistance to summary judgment, Titan argues that whether the information derives independent economic value from not being generally known or readily ascertainable by proper means and whether Titan made reasonable efforts under the circumstances to maintain the secrecy of the information presents questions of fact for the jury.

### a. Pricing and Pricing Strategies

Defendants first argue Titan cannot show that Titan's pricing and pricing strategy constitute trade secrets because such information (1) is available to, and may be disclosed by, an OEM manufacturer for any reason at any time without Titan's knowledge or consent; and (2) is readily ascertainable through proper means. Titan concedes that Ohrt and Allen did not acquire trade secret information from Titan by improper means but argues that (1) Allen and Ohrt had access to pricing information and strategy while employed by Titan, and (2) pricing information is confidential and therefore protected.

■ As an initial matter and contrary to Titan's assertions, the question of whether information constitutes a trade secret is a "mixed question of law and fact," *see Econ. Roofing,* 538 N.W.2d at 648, and "the Court," not a jury, "must determine whether [Titan] has proffered sufficient evidence to demonstrate that [the information in question] both derives independent economic value from not being generally known or readily ascertainable, and whether [Titan] took reasonable measures under the circumstances to maintain the secrecy of the method," *Sun Media,* 564 F.Supp.2d at 967. The first part of the question asks whether Titan "derived economic value because [its pricing and pricing strategy was] unknown to, and not readily ascertainable by, a person who would profit from [its] disclosure and use," and whether Titan "expended reasonable efforts under the circumstances to maintain secrecy of [its pricing and pricing strategy]." *Sun Media,* 564 F.Supp.2d at 968–69.

The Iowa Supreme Court has set out factors the court considers when determining whether certain information constitutes a trade secret, including,

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken … to guard the secrecy of the information; (4) the value of the information [to the business and its competitors]; (5) the amount of effort or money expended … in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Cemen Tech,* 753 N.W.2d at 7 (quoting *Kendall/Hunt Publ'g Co. v. Rowe,* 424 N.W.2d 235, 246 (Iowa 1988) (alteration in original)).

■ The elements of a claim of misappropriation of trade secret under the Iowa Uniform Trade Secrets Act and Iowa common law are practically indistinguishable. *See id.* (quoting *Basic Chems., Inc. v. Benson,* 251 N.W.2d 220, 226 (Iowa 1977), and listing the factors to be considered when

determining whether information constitutes a trade secret); *Lemmon v. Hendrickson*, 559 N.W.2d 278, 279 (Iowa 1997) (listing the elements of a common law misappropriation of trade secrets claim as "(1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of the secret"); *see also NCMIC Fin. Corp. v. Artino*, 638 F.Supp.2d 1042, 1077 (S.D.Iowa 2009).[5]

■ The record demonstrates that Titan's pricing and pricing strategy "could properly be acquired" by others. *See Cemen Tech*, 753 N.W.2d at 7. Jeff Vasichek (Vasichek), Titan Vice President of Sales and Marketing, acknowledged that AGCO, Kubota, and CNH[6] were BFNA customers before Allen or Ohrt left Titan. Vasichek further stated that as BFNA customers, BFNA "would know [the OEMs] were in the market for [certain types of tires], what their needs were, [and] what ... kind of equipment that they bought tires for." Defs.' App. 76. Therefore, because BFNA's business relationship with AGCO, Kubota, and CNH, preceded Allen and Ohrt leaving Titan, the needs of those OEMs was readily ascertainable to BFNA and unnecessary for Allen or Ohrt to provide it.

Next, the record shows Titan's pricing and pricing strategies were known outside Titan. *See Cemen Tech*, 753 N.W.2d at 7. Titan denied that BFNA would have had access to Titan's pricing because Titan's specific product prices are quoted to customers as a contract; however, Vasichek admitted that when Titan presents its pric-

ing strategy to its OEM customers, Titan does not ask the OEM customers to sign confidentiality agreements. Vasichek described Titan's pricing strategies with OEM customers as something "we had put together on approaching [the customer] on positioning of our product" and that Titan revealed to the customer "the price position or the price level of the offerings to the customer, the reasoning for it, and the future plans of moving ahead with the pricing." Titan's Resp. to SUF ¶¶ 59–60; Defs.' App. 73. Vasichek qualified, however, that Titan does not share "margin-related data" with OEMs. Vasichek also said that while Ohrt would have been present at the Titan–OEM strategy meetings, he did not know whether Ohrt had any knowledge of margin-related data.

In addition, while there is no dispute that certain aspects of customer information, such as volume and pricing information, have been treated as confidential by both Titan and BFNA, customer pricing information ultimately belongs to the customer and can be divulged by the customer to anyone if the customer is willing to provide that information. Vasichek admitted that OEMs have shared Titan's pricing information with other OEMs as well as with Titan's competitors. Vasichek also admitted that once an OEM's product needs are known, Titan's competitors will also know those needs. Vasichek testified that prior to approaching a client, Titan puts together an approach strategy, which would include the pricing position, the reason for the pricing, and the future for moving ahead with the pricing. In addi-

---

5. While the Iowa Supreme Court has specifically found "Chapter 550 has not preempted all tort theories involving trade secrets," *see* *205 Corp. v. Brandow*, 517 N.W.2d 548, 552 (Iowa 1994), Titan has only alleged misappropriation of trade secret; and thus the same analysis applies to both Titan's claims under Iowa Uniform Trade Secrets Act and under Iowa common law. *See Cemen Tech*, 753 N.W.2d at 7.

6. Titan listed only AGCO, Kubota, and CNH in answer to BFNA's interrogatory asking Titan to identify those Titan customers whom Defendants had allegedly contacted after leaving Titan.

tion, Taylor provided an example of how Titan customers have shared Titan pricing strategies, stating that AGCO shared Titan's "pricing, design, everything" with another large wheel company, and that as a result, Titan "shut them down" as a customer. Defs.' Supp. App. 4–5. However, Taylor admitted that the shut down only "went on and off for 30[or] 60 days," and Titan continues to sell AGCO tires and wheels because AGCO is "a very good account." Defs.' Supp. App. 4–5. Thus, by Titan's own admissions Titan's pricing and pricing strategies are not carefully protected or secret in the industry.

Furthermore, Titan's pricing strategy as described by Vasichek, is a non-static process. Vasichek explained that Titan puts together an approach strategy, including the pricing position, the reason for the pricing, and the future for moving ahead with the pricing, prior to approaching the OEM customer, and indicated that the pricing strategies vary depending on the customers' needs. Titan does not argue nor is there any evidence that Allen and Ohrt were aware of or had access to Titan's pricing strategies after leaving Titan. By Vasichek's own description, Titan's unique, per customer and per contract pricing strategy would thus not be the same strategies Titan used when Allen and Ohrt worked for Titan.

The record offers no more than Titan's own allegations that Allen and Ohrt had access to or acquired pricing and pricing strategies while employed by Titan. *See Cemen Tech*, 753 N.W.2d at 7. Vasichek testified that as a Titan employee, Ohrt had access to certain Titan pricing and cost information; however, Vasichek could not identify specific information Ohrt had access to and was unaware whether Ohrt had knowledge of margin-related pricing information, which is the only information Titan alleges it does not release to its customers. Titan similarly offers no more

than supposition that Allen had acquired margin-related pricing information during Allen's employment with Titan or that Allen took any such information with him when he resigned from Titan. At his deposition, when asked about Titan's allegation that Allen used confidential information from Titan to win a sales contract with a Mexican company for BFNA, and that based on Allen's knowledge of Titan's pricing, Allen priced BFNA products below Titan's prices resulting in Titan losing sales of more than one million dollars each year, Campbell affirmed that other than supposition, he had no knowledge that Allen used confidential information.

Regarding Ohrt, Taylor testified that after Ohrt commenced work with BFNA, Ohrt was able to price BFNA products to OEMs, including CNH, AGCO, and Kubota, at levels below Titan prices. In support of this contention, Taylor testified that after Ohrt left Titan, a representative for CNH, Tim Flick (Flick), told Taylor that after leaving Titan Ohrt visited CNH and "beat your Titan pricing." Defs.' Supp. App. 16, Taylor Dep. 88:3–11. Taylor admitted, however, that Ohrt did not present Flick with Titan's "price list in this hand" and say, " 'I'm beating it.' He didn't do that." Defs.' Supp. App. 17. Taylor further testified that he had similar conversations with AGCO and Kubota representatives but could not recall the representatives' names or specifics about those conversations. Despite Taylor's assertions that after his deposition he would provide Defendants with this information, Titan never supplemented the record or provided affidavits to support the alleged conversations.

Taylor never identified those conversations in the affidavit he submitted prior to his deposition, and similarly, Titan denied having any way of admitting or denying Defendants' statement of undisputed fact

that as a BFNA employee, Ohrt never called on CNH or worked on strategy relating to CNH.[7] Titan does not explain these conflicting responses nor does Titan address the undisputed fact that Ohrt worked in BFNA's forestry products division and that his top two OEM customers for BFNA were Kubota, which was not Ohrt's customer while at Titan, and Unverferth, which Titan alleges Ohrt "called on," but provides no details of any sales relationship Ohrt had with Unverferth while a Titan employee. There is no record evidence to dispute Ohrt's alleged statement to Flick that he would beat Titan's pricing was other than sales jargon, and thus is not evidence of misappropriation of a trade secret. Regarding Allen, Taylor averred that Allen was able to use confidential Titan information to "undercut Titan's pricing" with one of the companies in Mexico but admitted that his conclusions were based on his experience in the industry and that he had no personal knowledge for this contention. Defs.' Supp. App. 12, Taylor Dep. 70:5–71:9.

Regarding the value Titan's pricing and pricing strategy information held for Allen, Ohrt, and BFNA, *see Cemen Tech*, 753 N.W.2d at 7, both Vasichek and Taylor generally stated that Ohrt and Allen used Titan's confidential information to compete against Titan on behalf of BFNA. Vasichek, Taylor, and Campbell each denied having any specific information or evidence, such as names or documents, to demonstrate that Allen or Ohrt used confidential Titan information as BFNA employees. Taylor further admitted he had no direct personal knowledge to support Titan's allegations that BFNA acquiesced in and encouraged Ohrt and Allen to use

trade secrets and/or customer lists. Instead, Taylor said support for his contention that Ohrt and Allen had used Titan's trade secrets was based upon Taylor's experience in the business and "good common sense." Pl.'s Supp. App. 8, Taylor Dep. 70:5–71:9.

Regarding efforts to maintain trade secrets, *see Cemen Tech*, 753 N.W.2d at 7, Titan argues it took reasonable measures, including (1) requiring all employees to abide by the employee handbook and the provision therein to keep company information confidential, (2) using password protections, (3) marking "confidential" on certain documents, and (4) keeping certain information, such as pricing for particular accounts, secret and only allowing specific employees access to that information. Titan also notes that access to Titan's facilities is limited by security guards, associate building access requires a punch code and palm scan, and visitor access is restricted and monitored. With the exception of allowing only specific employees access to pricing, the security measures Titan mentions are general corporate security measures and not specifically designed to protect pricing. Titan, through its representatives, offers no evidence that Allen or Ohrt had special or exclusive access or that they ever took or disclosed any pricing information. Neither has Titan shown that during the relevant time others did not have access to the same pricing information.

Titan has failed to demonstrate that its pricing information constitutes a trade secret as that concept is recognized in the law.

---

7. In its statement of undisputed facts, Defendants also proffered that Ohrt did not know BFNA had acquired more business from CNH until Ohrt read Jeff Vasichek's deposition testimony taken in connection with this lawsuit.

To this statement, Titan similarly responded that it admitted Ohrt made that statement but had no way of admitting or denying the statement. Titan's Resp. to SUF ¶ 40.

### b. Product Costs and Product Development Information

Defendants next argue Titan cannot show (1) that Titan's product costs constitute trade secrets because, liking pricing, product costs cannot be the subject of "reasonable efforts by Titan to maintain [their] secrecy," or (2) that Titan developed any new products while Allen and Ohrt were employed by Titan. Titan resists by generally asserting documentary support is not required to prove that Ohrt and Allen improperly used Titan's product costs and product development information and relies on the testimonies of Campbell and Taylor, who assert that based on their experience and common sense, they believe Allen and Ohrt used protected information.

■ Allen testified that "many years ago" after accepting the marketing position at Titan, he had knowledge of information relating to Titan's "LSW" tire. Defs.' App. 40, Allen Dep. 19:7–14. Allen further testified, however, that the LSW tire information has been disclosed to the public through Titan's annual reports and Securities and Exchange Commission Form 10–K filings (10–K filings). Titan admits this information is now public but denies that it was made public prior to Allen's resignation.

Titan's product development allegation regarding the LSW tire is left vague in the record. Titan admits the LSW tire is public information and failed to produce any details regarding when the LSW tire information became public to support its charge that it was not public prior to Allen's resignation. By failing to produce this information, Titan has not demonstrated this information had economic value

and thus has failed to establish its proprietary interest in the product at the relevant time.

Titan also argues that Allen and Ohrt would have been aware of Titan's development of strip winding technology.[8] This argument, however, is undermined by conflicts between Taylor's testimony and Campbell's testimony. Taylor testified that Titan's strip winding technology was developed by Titan working in conjunction with Woo Song, a Korean machine manufacturer. Campbell, on the other hand, testified that he and Doug Pospisil developed the strip winding technology using a machine built by Italian machine manufacturer, Maringoni. Campbell said that Woo Song sold Titan's strip winding technology to Titan's competitors, which resulted in a lawsuit brought by Titan against Woo Song but that the parties reached an out-of-court settlement. Campbell testified that it was Woo Song who told Campbell that BFNA was using the strip winding technology.

Regarding Allen and Ohrt's connection to Titan's strip winding technology, Taylor testified that Titan was developing strip winding technology when Allen and Ohrt were Titan employees. Taylor also said that after leaving Titan and joining BFNA, Allen was responsible for hiring engineers for BFNA that had previously worked for Titan and that Allen worked with those engineers to make sure that BFNA obtained "proprietary equipment necessary to compete with Titan." Defs.' Supp. App. 15. Taylor admitted having no direct knowledge of this contention but said it was Campbell who provided the information. When asked about this, Campbell

---

**8.** In his deposition, Taylor acknowledged that BFNA used a type of strip winding technology before Allen and Ohrt began working for BFNA explaining that " 'strip winding' was developed years and years ago;" however, according to Taylor, Titan developed a unique type of strip winding technology that "nobody did it exactly that way." Defs.' Supp. App. 14.

acknowledged that Allen and Ohrt were not involved in the development of strip winding technology but averred that "they were there to witness the advances in it, absolutely." Defs.' Supp. App. 26, Campbell Dep. 44:11–12. Campbell also testified that after Allen left Titan, Campbell received information that BFNA hired former Titan engineers who were involved in developing strip wind technology. Campbell, however, denied having any evidence or personal knowledge that Allen had any involvement in recruiting the former Titan engineers for BFNA.

The parties disagree on the number of new products Titan produced while Ohrt was a Titan employee. Defendants assert that the LSW tire was the only new product conceived by Titan during Ohrt's tenure there, but Titan asserts it offered "new and different sizes of tires, tire types, ply ratings, compounds, and the like" throughout the time that Ohrt was employed by Titan. Titan's Resp. to SUF ¶ 67; Titan's App. 55. Titan has not provided evidentiary support in the record for these assertions nor demonstrated Ohrt's access to or involvement in Titan's product development.

Titan has failed to demonstrate the extent to which Allen or Ohrt possessed any product development information. Furthermore, even if Allen and Ohrt possessed such information, Titan has failed to demonstrate that Titan had not already disclosed that information to the public by the time Allen and Ohrt left Titan, and thus Titan has failed to generate a fact issue that it had any product development trade secrets during the relevant time.

#### c. Customer Lists and Contracts

Defendants argue that Titan has failed to demonstrate its customer lists are trade secrets because (1) OEMs are known throughout the tire industry; (2) the major OEMs at the center of this case—Kubota, CNH, and AGCO—were customers of BFNA before Allen and Ohrt left Titan, and therefore the customer information of those OEMs was readily ascertainable to BFNA before Allen and Ohrt left Titan; and (3) neither Allen nor Ohrt brought any Titan customer lists with them when they left Titan and went to work for BFNA. Defendants also argue that OEMs' tire product specifications and needs are widely known between competitors and were well known to BFNA through its existing relationships.

While certain customer information could constitute a trade secret, see Econ. Roofing, 538 N.W.2d at 647, the customer information in this case does not qualify because that information was readily ascertainable in the marketplace as evidenced by the testimonies of Vasichek, Campbell, and Taylor.

Vasichek admitted that "anybody who is selling agricultural tires would know that they were in the market for them, what their needs were, what—their kind of equipment that they bought tires for." Defs.' App. 76, Vasichek Dep. 33:8–13. Vasichek also acknowledged that Kubota, CNH, and AGCO were customers of BFNA before Ohrt left Titan. Additionally, Vasichek denied having any personal knowledge that Allen, Ohrt, or BFNA shared or possessed knowledge of Titan's methods of quoting prices to OEMs. Campbell affirmed that Titan knew who its competition was, stating that "[w]hen you call on a customer, you pretty well know who your competition is. . . ." Defs.' Supp. App. 27. When asked whether determining which competitors sold to an OEM was easily ascertainable, Campbell answered, "I would say so, yes." Defs.' Supp. App. 27. Taylor agreed that a Titan salesman would "not [be] doing his job" if he did not know which competitors did business with Titan's customers. Defs.' Supp. App. 6. Furthermore, BFNA instructed Ohrt not

to bring anything, including customer lists, with him from Titan; Ohrt contends he complied with those instructions. Titan rebuts this contention only by asserting that it has "no way of admitting or denying this statement or whether Ohrt complied with this instruction, if it was given." SUF ¶¶ 19, 20. For these reasons, Titan has failed to generate an issue of material fact that its customer information was not readily ascertainable in the marketplace.

The sum and substance of Titan's resistance to Defendants' motion for summary judgment on the claim of misappropriation of trade secret is that a jury question exists because (1) Allen and Ohrt "recognized the confidential nature of the pricing information" (Defs.' Br. 8); (2) Titan took sufficient measures to keep the information confidential by way of confidentiality provisions in its employee handbook, use of password protections and building security measures, and by stamping "confidential" on certain documents; and (3) although Titan is not required to demonstrate Allen and Ohrt actually used the trade secret, Titan has lost millions due to BFNA's ability to undercut Titan's prices *through the knowledge Allen and Ohrt possessed.*

■ Relying on the doctrine of inevitable disclosure espoused by the Seventh Circuit Court of Appeals in *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995), Titan argues that when an employee has knowledge of his former employer's strategies and pricing information, trade secret misappropriation may be proven by demonstrating the employee's new employment will inevitably lead him to rely on the former employer's trade secrets. While *Redmond* dealt with fierce competitors in the sport drink industry, *id.* at 1263–65, and the present case deals with fierce competitors in the tire manufacturing industry, that is the full extent of the similarities between the two cases.

In *Redmond,* plaintiff PepsiCo sought injunctive relief to prevent competitor Quaker Oats from employing William Redmond, who had been PepsiCo's General Manager of Northern California Business Unit, and later PepsiCo's General Manager of the business units covering all of California, which had annual revenues that exceeded $500 million or 20 percent of PepsiCo North America's profit for all of the United States. *Id.* at 1264. In the spring of 1994, Quaker Oats began courting Redmond, and on November 8, 1994, Quaker extended Redmond a written offer. *Id.* On November 10, 1994, Redmond informed PepsiCo he intended to accept the offer, and PepsiCo responded by filing a lawsuit seeking injunctive relief to prevent Redmond from assuming duties at Quaker in order to prevent Redmond from disclosing trade secrets. *Id.* at 1264–65.

In securing injunctive relief, PepsiCo presented evidence that Redmond had attended PepsiCo's strategic planning meeting in July 1994, at which PepsiCo presented plans for new beverages, and Redmond received PepsiCo's " 'Strategic Plan,' an annually revised document that contain[ed] [PepsiCo's] plans to compete, its financial goals, and its plans for manufacturing, production, marketing, packaging, and distribution for the coming three years." *Id.* at 1265. PepsiCo also presented "[t]estimony and documents [that] demonstrated Redmond's awareness of these plans and his participation in drafting some of them." *Id.* PepsiCo offered evidence it had spent over one million dollars on "innovations in its selling and delivery systems" and demonstrated Redmond had knowledge of these innovations because PepsiCo tested its pilot program in California where Redmond was PepsiCo's General Manager. *Id.* at 1266. Quaker contended that Redmond's intimate knowledge of PepsiCo's strategies would be irrelevant because Red-

mond would only be implementing plans already in place when he arrived. *Id.* PepsiCo rebutted PepsiCo's contention by demonstrating Redmond would not simply be implementing a business plan already in place, and therefore Redmond's intimate knowledge of PepsiCo's plans for the coming year would inevitably be disclosed to Quaker in his new position. *Id.*

In granting the preliminary injunction, the district court "emphasized Redmond's lack of forthrightness both in his activities before accepting his job with Quaker and in his testimony as factors leading the court to believe the threat of misappropriation was real." *Id.* at 1267. The Seventh Circuit affirmed, concluding PepsiCo presented substantial evidence that "Redmond possessed extensive and intimate knowledge about [Pepsico]'s strategic goals for 1995," and it was not Redmond's "general skills and knowledge acquired during his tenure with PepsiCo that PepsiCo [sought] to keep from falling into Quaker's hands;" rather PepsiCo sought to protect PepsiCo's "particularized plans or processes," which were disclosed to Redmond "while the employer-employee relationship existed, which [we]re unknown to others in the industry and which give the employer an advantage over his competitors." *Id.* at 1269 (internal quotations omitted). Recognizing the doctrine of inevitable disclosure, the court held,

> Admittedly, PepsiCo has not brought a traditional trade secret case, in which a former employee has knowledge of a special manufacturing process or customer list and can give a competitor an unfair advantage by transferring the technology or customers to that competitor. PepsiCo has not contended that Quaker has stolen [PepsiCo's] formula or its list of distributors. Rather PepsiCo has asserted that Redmond cannot help but rely on [PepsiCo's] trade secrets as he helps plot [Quaker's] new course, and that these secrets will en-

able Quaker to achieve a substantial advantage by knowing exactly how [PepsiCo] will price, distribute, and market its sports drinks and new age drinks and being able to respond strategically. This type of trade secret problem may arise less often, but it nevertheless falls within the realm of trade secret protection under the present circumstances.

*Id.* at 1270 (internal citations omitted).

■ *Redmond* actually provides a striking example of what Titan needed to do, but did not. Titan has not presented any evidence that either Allen or Ohrt possessed such *intimate* knowledge of *specific* plans or that their positions with BFNA would garner the influence that Redmond did in the *Redmond* case. In this case, Titan has produced absolutely no evidence that Allen or Ohrt brought anything more than their own respective "general skills and knowledge" of the tire industry, which does not constitute a trade secret even if they acquired that general knowledge while under Titan's employ. *See id.* at 1269.

The entirety of Titan's allegations against Allen and Ohrt amount to speculation, supposition, and conclusory allegations by self-interested individuals, namely Titan's Vice President of Sales and Marketing (Vasichek), Titan's CEO (Taylor), and Titan's President (Campbell). Titan's alleged evidence of misappropriation of trade secrets can be summed up with Taylor's response to a question about his personal knowledge that Allen used Titan's confidential information to undercut Titan in making bids for BFNA, stating "Well, I'll chalk it up to my being in this business longer than anyone sitting at this table that that's what happens." Defs.' Supp. App. 12, Taylor Dep. 70–71. While the Court views the facts in the light most favorable to Titan, the nonmovant, the business instincts of interested corporate

executives are not enough. Titan "must set forth specific facts sufficient to raise a genuine issue for trial" and "may not rest upon mere denials or allegations in the pleadings." *Miner,* 513 F.3d at 860. Titan has failed to accomplish that task on this record, and thus Titan's claims for misappropriation of trade secrets against Defendants fail as a matter of law.

Regarding the claim for misappropriation of trade secret against BFNA, the analysis begins with the recognition that without a trade secret, Titan cannot maintain a claim for misappropriation of a trade secret. *See, e.g., Electro–Craft Corp. v. Controlled Motion, Inc.,* 332 N.W.2d 890, 897 (Minn.1983). Thus, the Court's finding, supra, creates an insurmountable impediment to this claim.

■ Proceeding with an analysis akin to that performed in regard to Allen and Ohrt, however, Titan has not pointed to, nor can the Court find, anything in record to demonstrate BFNA "knowingly allowed, endorsed, encouraged, induced, and/or permitted the use" of even assumed Titan trade secrets and/or customer lists in connection with Allen and Ohrt's employment with BFNA as alleged in Titan's amended complaint. In fact, the available record addressing BFNA in this regard demonstrates the contrary, that BFNA took affirmative steps to prevent potential misappropriation.

For example, regarding Ohrt's OEM clients, Ohrt testified that after taking the job with BFNA, BFNA never had him call on CNH because it was one of Ohrt's major OEM clients when Ohrt worked for Titan. Ohrt also said his major OEM clients for BFNA were Unverferth and Kubota, which were not clients of his when he worked for Titan. Regarding AGCO, Ohrt noted that when he went to work for BFNA, he was assigned to cover AGCO facilities in Jackson, Minnesota, and Hesston, Kansas, whereas when he was em-

ployed by Titan, Ohrt covered AGCO facilities in Duluth, Georgia, and Sioux City, Iowa. In addition, Allen testified that once Ohrt arrived at BFNA, Ohrt was assigned to BFNA's existing OEM clients for which Ohrt had not been responsible while at Titan, and that furthermore, BFNA assigned Ohrt to the forestry products division—a product line Titan did not carry while Ohrt was a Titan employee.

Similarly, BFNA assigned Allen to an export position that involved "sales, logistics, compliance with anything related to activity of customers outside the U.S. and Canada for agricultural tires." Defs.' App. 43. Allen testified that he held that position with BFNA for three years to avoid overlap with Titan customers. Allen further testified that BFNA specifically instructed him not to bring anything with him from Titan and that he did not bring anything with him when he left Titan.

As with its resistance to the motion for summary judgment on its claims against Allen and Ohrt, Titan relies on the testimonies of Vasichek, Taylor, and Campbell to defeat summary judgment. When asked whether he had any proof BFNA tried to acquire Titan's trade secrets, Taylor said, "Not at this point." Defs.' Supp. App. 7. Taylor also denied knowing whether BFNA had any of Titan's pricing documents relating to costs or margins, stating, "No. I don't go through the records. I'm just saying … they should." Defs.' App. 6. Similarly, when Campbell was asked if he had any direct knowledge to support Titan's allegation that BFNA "knowingly allowed, endorsed, encouraged, induced and/or permitted" use of Titan's "trade secrets and/or customer lists," Campbell responded, "No." Defs.' Supp. App. 28. Vasichek, also denied having any support for the contention that BFNA recruited Allen and Ohrt to work for BFNA "because of their in-depth knowledge of Ti-

tan's products, pricing and customers." And, when asked whether he had personal knowledge BFNA tried to acquire Titan's trade secrets, Vasichek answered, "No." Defs.' App. 85.

As previously stated in regard to Titan's claims against Allen and Ohrt, Titan cannot defeat summary judgment on its claim of misappropriation of trade secrets against BFNA by relying on the common sense and extensive industry experience of its corporate leaders. *See Sun Media*, 564 F.Supp.2d at 965 ("[Titan] cannot simply rest on [its] laurels and proclaim summary judgment inappropriate. Rather [it] must come forward with some actual evidence, supported by the record in the case, showing a genuine issue for trial.") (quoting *Atwood v. Vilsack*, 338 F.Supp.2d 985, 1004 (S.D.Iowa 2004)). Accordingly, Titan's claim for misappropriation of trade secret against BFNA also fails as a matter of law.

### C. Breach of Contract

Titan alleges a breach of contract claim against Ohrt only. In moving for summary judgment, Ohrt argues that Titan cannot prove the elements of a breach of contract because (1) the Agreement fails for lack of sufficient consideration, (2) the memorandum Ohrt attached to the Agreement demonstrates that the terms and conditions of the Agreement did not exist when Ohrt signed the Agreement, and (3) Titan has not shown it has been damaged by Ohrt's alleged breach of the Agreement. Titan resists summary judgment arguing a contract existed, which was supported by adequate consideration; Ohrt violated the terms and conditions of that contract; and Titan suffered damages.

Under Iowa law,[9] the elements of a breach of contract claim are "(1) an employment contract existed between the parties; (2) the terms and conditions of the contract; (3) Plaintiff fulfilled the terms and conditions of the contract; (4) Defendants breached the contract in some manner; and (5) Plaintiff suffered damages as a result of the breach." *Van Arkel v. Warren County*, 365 F.Supp.2d 979, 986–87 (S.D.Iowa 2005) (citing *Kish v. Iowa Cent. Cmty. Coll.*, 142 F.Supp.2d 1084, 1093 (N.D.Iowa 2001), applying Iowa law). Proving the existence of an employment contract requires the plaintiff to "show that the parties were capable of contracting, there was an offer and acceptance, and there was consideration." *Id.* at 986 (citing *Magnusson Agency v. Pub. Entity Nat'l Co.*, 560 N.W.2d 20, 25 (Iowa 1997) (listing these items as the first three elements of a breach of contract claim) (citing Iowa Civ. Jury Instr. 2400.1)). "The only required elements of a binding contract are mutual assent to the contractual terms manifested by an offer and acceptance." *In re Guardianship & Conservatorship of Price*, 571 N.W.2d 214, 216 (Iowa Ct.App. 1997). "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Magnusson Agency*, 560 N.W.2d at 27).

The Agreement at issue in this case contains fifteen paragraphs detailing Titan's confidentiality, non-compete, at-will employment, and termination policies. Specifically at issue is paragraph ten of the Agreement, which provides as follows:

**9.** Paragraph eight of the Agreement designates that the jurisdiction of any action for enforcement of provisions of the Agreement would be to "the Illinois Circuit Court for Adams County, in the State of Illinois." Defs.' App. 22. The Agreement does not contain a choice of law provision, and neither party contests the application of Iowa law.

During my employment, and for a period of three (3) years after termination of my employment with the Company, whether terminated with or without cause, I will not directly or indirectly, (a) divert or attempt to divert any person, concern, or entity which is furnished services by the Company from doing business with the Company or otherwise to change its relationship with the Company; or (b) induce or attempt to induce any customer or supplier of the Company to cease being a customer or supplier of the Company or otherwise to change its relationship with the Company; or (c) render services, directly or indirectly, to any *Conflicting Organization* in connection with the sale, merchandising, or promotion of a *Conflicting Product* to any customer or supplier, or prospective customer or supplier, of the Company with whom I had direct or indirect contact or about whom I may have acquired any knowledge prior to termination of my employment with the Company.

Defs.' App. 23.[10] The final paragraph stated, "In consideration of my employment with the Company and the other good and valuable consideration received by me; I acknowledge that I have read and understand the provisions of this Agreement, that the provisions of this Agreement are reasonable, and that I have received a copy of this Agreement." Defs.' App. 24.

Before signing and dating the Agreement, Ohrt made several modifications to the Agreement. First, in the margin alongside paragraphs five and thirteen—the retroactivity and the at-will employment provisions, respectively—Ohrt noted, "please comment on attached concern," and "please clarify—see attachment." Also, alongside paragraph ten, the noncompete provision, Ohrt wrote in the margin, "Please Clarify 'underlined.'" In paragraph ten, Ohrt underlined the words "Conflicting Organization" and "Conflicting Product." Finally, on the last page of the Agreement immediately below his signature, Ohrt wrote, "Note: Please see attached memo for clarification on mentioned items. I look forward to Titan's comments." Defs.' App. 22–4.

Ohrt attached the following memorandum to the Agreement: [11]

Following this memo is the Confidentiality Agreement that Titan has asked me to sign. As you can see I have signed it. I am very concerned with signing an agreement like this due to the fact that this type of business has been in my blood for my entire career. *Again I have signed this with the understanding that I would like to discuss this in further detail in person with Morry.* I know Morry and I are very busy but maybe we can get together at the farm show. Listed below are the concerns that I have of which I need further clarification on. They are:

1. If Titan is sold is this agreement still effective?

2. If I am terminated with or without reason (me being over 50 yrs old) and being in this business since 1981 Titan is saying I can't work in the wheel or tire market for a period of 3 years? Please explain. This has been my career. I have no intentions of leaving Titan as I mentioned to Morry in the meeting a few weeks ago.

3. Does this agreement force me out of the tire and wheel market for a period of 3 years.

4. Is there any consideration/severance from Titan if terminated?

---

10. The Court's recitation of the Agreement includes the underlining added by Ohrt.

11. The Court presents Ohrt's memorandum without noting grammar, punctuation, or spelling errors.

5. Why 3 years?

6. Paragraph # 5—can this be changed to > this day forward instead of since I started with Titan in 1994?

7. Paragraph # 10—could Titan please clarify "Conflicting Organization" and "Conflicting Product"?

8. Paragraph # 13—My termination can be of "no reason". Should I be concerned? Please explain.

9. Vacation.

Please don't misunderstand me in all my questions. As I mentioned I am committed to Titan and plan to work for Titan the rest of my career. I have one child in college and one in high school. For some reason I am very nervous about this. Should I be? Please advise. I look forward to discussing these items with Morry. In the event I can't meet with Morry soon could you comment on my concerns?

Thank you very much.

Tim Ohrt

Titan's App. 26 (emphasis added).

### 1. Sufficient Consideration

■■■ Titan rebuts Ohrt's contention that the Agreement lacked sufficient consideration, asserting that Ohrt's continued employment constitutes sufficient consideration. As Ohrt concedes, continued employment following the execution of a restrictive covenant can be sufficient consideration to support a contract. *See Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983) ("[C]ontinued employment for an indefinite period of time is sufficient consideration to support a covenant not to compete."); *see also Cent. States Indus. Supply, Inc. v. McCullough*, 279 F.Supp.2d 1005, 1031 (N.D.Iowa 2003) ("[U]nder Iowa law, continued employment is consideration that will support a contract."). Here, however, Defendants argue under *Iowa Glass*

*Depot, Inc. v. Jindrich*, 338 N.W.2d at 381, the consideration of continued employment was inadequate given the potential for disproportionate injury to Ohrt and gain to Titan.

The adequacy of the consideration in the present case turns on the terms of the Agreement, *see id.*, which likewise turns on whether a binding agreement exists, *see Shaw v. Buser*, 770 N.W.2d 851, at *5 (Iowa Ct.App.2009) (unpublished table decision) ("We begin our discussion with the oft-stated proposition that 'there can be no contract without a meeting of the minds of the parties.'" (quoting *Lamson v. Horton–Holden Hotel Co.*, 193 Iowa 355, 185 N.W. 472, 474 (1921))). Thus, the Court must first determine whether an enforceable agreement existed.

### 2. Valid Agreement

■■■ It is undisputed that Ohrt submitted the signed Agreement with an attached memorandum asking for clarification of several provisions in the Agreement. It is also undisputed that Titan acknowledged the concerns Ohrt set out in the memorandum and assured Ohrt his concerns would be addressed by either Titan's legal department or by Taylor. However, as Titan admits, no one at Titan ever responded to Ohrt's concerns. Ohrt argues that because he sought clarification of several terms of the Agreement, including those at issue here, and Titan knew of and acknowledged Ohrt's request for clarification but did not provide that clarification, no meeting of the minds occurred to support contractual intent and mutuality, which are required parts of a contract, and therefore the Agreement is invalid. The Court agrees.

As set forth above, the notations on the Agreement itself, as well as enumerated items in Ohrt's memorandum, detailed concerns Ohrt had with the non-compete provision, specifically seeking clarification on

(1) whether the non-compete provision would preclude him—a man over 50 years old—from working in the wheel and tire industry that he had worked in his entire career, (2) whether and/or why the duration of the provision was for three years, and (3) Titan's definition of the terms "conflicting organization" and "conflicting product." Those provisions are material terms to the Agreement as those are the same terms Titan now seeks to enforce asserting, "Ohrt has clearly violated Paragraph 10 of the Agreement, the non-compete provision, by working for Bridgestone Firestone and attempting to divert sales from Titan to Bridgestone Firestone." Titan's Br. 13.

"A contract requires offer, acceptance, and sufficiently definite terms to be enforced." *Wells Dairy, Inc. v. Am. Indus. Refrig., Inc.*, 762 N.W.2d 463, 475 (Iowa 2009) (citing *Horsfield Const., Inc. v. Dubuque County, Iowa*, 653 N.W.2d 563, 570 (Iowa 2002) (noting that Iowa has adopted the Restatement (Second) of Contracts § 27 (1981))). "To be bound, the contracting parties must manifest a mutual assent to the terms of the contract." *Rick v. Sprague*, 706 N.W.2d 717, 724 (Iowa 2005). "'In a contract by offer and acceptance, the acceptance must conform strictly to the offer in all its conditions, without deviation or condition whatever.' Otherwise there is no mutual assent and therefore no contract." *Id.* (quoting *Shell Oil Co. v. Kelinson*, 158 N.W.2d 724, 728 (Iowa 1968) (internal citation omitted)). "A conditional acceptance, that is, one which expresses a willingness to enter into a contract on terms which differ from the offer, is a rejection of the offer and constitutes a counteroffer which invites acceptance of

the modification." *John T. Jones Const. Co. v. Hoot Gen. Const.*, 543 F.Supp.2d 982, 1017 (S.D.Iowa 2008) (citing *Rick*, 706 N.W.2d at 724).[12]

From the modifications Ohrt added to the face of the Agreement, as well as the memorandum Ohrt attached to the Agreement when he submitted it to Titan, the Court finds Titan and Ohrt had no meeting of the minds regarding essential elements in the Agreement. Without mutual assent, the Agreement is not binding, *see id.*, and thus Titan's claim against Ohrt for breach of the Agreement necessarily fails, *see Wells Dairy*, 762 N.W.2d at 475.

## III. CONCLUSION

For the forgoing reason, Defendants' Motion for Summary Judgment (Clerk's No. 23) and Supplemental Motion for Summary Judgment (Clerk's No. 39) must be **granted,** and this case is **dismissed.**

**IT IS SO ORDERED.**

---

12. The parties do not argue, and therefore the Court does not address, any specific legal significance to the fact that Ohrt returned the Agreement with his signature affixed. Despite Ohrt's expression of willingness to enter into *a* contract, he expressed material reservations about entering *this* contract absent further clarification. Thus, the Court looks beyond the signature for the totality of the circumstances in concluding there was no meeting of the minds on this Agreement.